HARRIET ELLA KREMELBERG et al., appellants,.

*v.*

EDITH K. THOMPSON et al., respondents.

[Decided July 13th, 1917.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Stevens, who filed the following opinion:

This is a bill for an accounting. The complainants are the children of John D. Kremelberg, late of the city of Baltimore. The defendant is the daughter and sole heir-at-law of J. George Kremelberg, deceased, a brother of John. The effort is to charge George's estate with a sum amounting to several hundred thousand dollars, on the theory that he failed to account for property derived from his brother, which, it is said, he held in trust for complainants. The property, in respect of which this trust is alleged to have arisen, was, if I understand complainants' position aright, John D. Kremelberg's share of the good-will of a commission business carried on by him in New York and Baltimore, which after his death came into the hands of George, and thereafter, it is said, produced large profits. The defendant denies the existence of any trust unperformed.

The facts are these: John D. Kremelberg was at the time of his death, in May, 1882, a commission merchant, engaged in the business of exporting tobacco. The Baltimore firm was known as J. D. Kremelberg & Company. Of this, John D. was almost sole owner, his son Frederick having a small but unknown and negligible interest that had been given to him by his father. The New York firm was known as Kremelberg & Company. It consisted of John D. Kremelberg, whose interest was twenty per cent., of J. George Kremelberg, whose interest was forty per cent., and of Adolph Engler, whose interest was also forty per cent. The business had no fixed capital, but John

had allowed a part of his profits to remain undrawn, and this constituted the capital for both firms. Other than this, they had no capital and no property. At the time of John's death, the business appears to have been fairly profitable, and John was reputed to be wealthy. His estate, however, realized only $136,-000, of which $50,000 came from the sale of the house in which he lived.

His will, made eight years before he died, contained the following clauses:

"I give, devise and bequeath to my brother, George, and my son J. Frederic, in equal proportions, all my interest in the following business houses, namely, Kremelberg & Co., New York, J. D. Kremelberg & Co., Baltimore; Kremelberg, Schaefer & Co., New Orleans [this last named firm had ceased to exist at his death], and in the assets and property of every kind of said houses or firms. * * * It is my will and I hereby direct that all my just debts and funeral expenses and the entire interest to which my wife may be entitled in my estate real and personal, shall be paid out of the proceeds of the rest and residue of my estate above mentioned, so that my interest in the business houses and firms above mentioned and devised to my brother George and my son J. Frederick shall remain wholly undisturbed and be in no way interfered with."

He appointed his brother George, his son Frederick and his friend Samuel H. Tagart his executors. Of these only Tagart qualified. He was a prominent Baltimore lawyer and a personal friend of the family.

None of the persons, who took an active part in the settlement of John's estate, except John's daughter Ella, are alive. His two sons died a few years after their father. The complainants base their case upon documents, of whose contents, it is said, complainants were until recently ignorant, and these I will take up in the order of their dates.

The first is the notice sent out by the surviving partners:

"Baltimore, May 31, 1882—Sir, It is our painful duty to inform you of the death of our highly esteemed senior partner, Mr. J. D. Kremelberg, on the 24th instant at Philadelphia, where he had gone for medical advice.

"The business in Baltimore, New York and Louisville will be continued as heretofore.

　　　　　"Yours very respectfully,
　　　　　　　　"J. Fred Kremelberg　⎫
　　　　　　　　"George Kremelberg·　⎬ New York.
　　　　　　　　"Ad. Engler　　　　　⎭
　　　　　　　　"Julius Wille, Louisville."

The inventory of testator's tangible property, made in July, 1882, does not appraise or even refer to testator's interest in the two firms. The paper next in order of date is a deed from Frederick Kremelberg to his Uncle George, dated on December 4th, 1882, by which, in terms that are absolute and unconditional, he transfers to him all his "estate, right, title, interest, claim and demand whatsoever in and to all the property devised and bequeathed * * * by the aforesaid item of said last will and testament"—that is, the item giving John's interest in the business houses above mentioned. Contemporaneously, George executed a trust deed as follows:

"Know all men by these presents that whereas by deed of even date herewith, perfected before the execution hereof, John Frederick Kremelberg, conveyed and assigned to me all the interest bequeathed to him in and by the will of his father, the late John D. Kremelberg, in and to the business houses Kremelberg & Co., New York; J. D. Kremelberg & Co., Baltimore; Kremelberg, Shaefer & Co., New Orleans, and in the assets and property of every kind of said houses and firms;

"Now I hereby declare that the said assignment and conveyance to me was made and that I now hold the said property in trust for the said John Frederick Kremelberg, Elizabeth Virginia Kremelberg, Harriet Ella Kremelberg, John Diedrich Kremelberg, Anna Marie Kremelberg, and Mary Augusta Kremelberg, in equal proportions share and share alike."

The only explanation offered as to why this trust deed was made was Frederick's dissipated habits. It is one of the two deeds on which this action is based.

The other trust deed bears date on May 4th, 1883, and reads as follows:

"Know all men by these presents that whereas John D. Kremelberg, late of the City of Baltimore, deceased, in and by his last will and testament dated the 18th of September, 1874, among other things, devised and bequeathed as follows, 'I give, devise and bequeath to my brother George and my son J. Frederick, in equal proportions all my interest in the following business houses, namely Kremelberg & Co., New York, J. D. Kremelberg & Co., Baltimore; Kremelberg, Schaefer & Co., New Orleans and in the assets and property of every kind of said houses or firms;' Now for divers good causes and valuable consideration me thereunto moving, I do hereby declare that I hold and possess the one half part of the property devised and bequeathed to me in and by the aforesaid clause or item of said will in trust for John Frederick Kremelberg, Elizabeth Virginia Kremelberg, Harriet

Ella Kremelberg, John Diedrich Kremelberg, Anna Maria Kremelberg and Mary Augusta Kremelberg, in equal proportions, share and share alike and agree with them to grant and assign the same to them whenever requested so to do, I paying to Messrs. Branker and Charles Martin each fifteen per cent. of the profits of said half part of the property devised and bequeathed to me as aforesaid and holding the other twenty per cent. thereof to my own use."

The first question is, What did the property so bequeathed and held in trust consist of? What the parties thought at the time it consisted of is not doubtful. On the day before the second deed was executed, Mr. Tagart swore to his first account, and in that account he charged himself with the following items: "Deceased interest in firm of Kremelberg & Co., $19,-577.91; deceased interest in firm of J. D. Kremelberg & Co., $31,980.74." The firm's books show, and it is conceded, that these figures represent the precise amount of the accumulated earnings left by John in the two firms named, for use as capital.

If these earnings constituted the whole of John's interest in the two firms, the complainants have no case, for the money has been fully accounted for. The insistment is that Mr. Tagart's account is wrong, in that he failed to charge himself with the value of the good-will and that George has, by the two deeds above set out, declared a trust in respect to it as well as of the money, and is now chargeable, not with its market value at the time of John's death, but with the earnings of both firms, made after their execution, as far as those earnings are attributable to John's interest. I have already said that this was made up of the entire interest in the Baltimore concern, and of a one-fifth or, it is said, a greater interest in the New York concern. These earnings cover a period of thirty years, and amount, it is asserted, to over $580,000. The rather startling claim is made that they belong to the defendants, less an allowance for management.

The question that arises on this contention is, Was there a good-will that was valuable?

John Kremelberg died at the age of fifty-five. He appears to have begun business as a commission merchant in New York in 1863. When he began in Baltimore does not appear, nor does it appear what profits he made between 1863 and 1882. All that

is fairly inferable from the testimony is that he lived well and was reputed wealthy.

The good-will of an established business like Wanamaker's or Altman's is, no doubt, very valuable and may long survive its creator. The good-will of the business of a successful professional man, practicing alone, if good-will it may be called, dies with him. He is employed because of his personal ability and reputation.

The good-will of the business of a commission merchant, originating with himself and carried on without fixed capital for fifteen or twenty years, would seem rather to resemble that of a doctor or lawyer than that of a retail merchant. John Kremelberg's business transactions were with European correspondents, and he was, we may conjecture, trusted and employed by them because he was found to be a man of integrity and business capacity and because, as is testified to by Mr. Stellman, "he had relations abroad which enabled him to obtain money to almost any extent."

The case of the two firms is somewhat dissimilar and will be considered separately.

First, as to the New York firm: The partners, in 1882, were John D. Kremelberg, George Kremelberg and Adolph Engler. John lived in Baltimore; George and Adolph Engler in or near New York. On January 1st, 1884, Engler owed the firm $4,-013.83; George, $8,894.66. The New York firm owed the Baltimore firm $26,523.91. There was, as far as appears, no other assets and no other debts, except the debt, if so it may be called, which the New York firm owed John D. Kremelberg's estate and which amounted to $31,980.74. This sum represented, probably, John's share of accumulated profits and, as I have said, constituted the firm's only capital. Now, it is at once apparent that had the executor of John's estate demanded payment, the New York firm would have been hopelessly insolvent. Its assets were less than $13,000 and its liabilities $57,000. I say this on the assumption—the only one that can be made—that the situation on January 1st, 1884, did not differ materially from the situation at the time of John's death in May, 1882.

The question is, What was the good-will of a firm thus circumstanced worth? Would anyone have given anything for the mere name, J. D. Kremelberg & Company? Had it been sold, George Kremelberg and Adolph Engler would have had the right to continue the business of commission merchants under an appropriate name. Would the European buyers have been likely to have thereafter dealt with the stranger who acquired the name rather than with George Kremelberg and Engler, whom they had long known and trusted and of whose business ability they had had satisfactory proof? Tagart, the executor, evidently thought the name of no pecuniary value. I say this because, as a lawyer of long experience, the friend, as well as the legal adviser of John, and the friend of his children, as well as the temporary custodian of their property, he could not have been ignorant of that species of property called good-will, and he must have desired to obtain for them all that the estate was capable of yielding, and yet, in his account, he did not attribute any value to it.

It seems to me that the evidence fails to show that the good-will of the New York concern had any substantial value.

Then we come to the Baltimore firm: This was composed of John D. Kremelberg and his son Frederick, a young man of dissipated habits, whom he had admitted as a partner with so small an interest that no witness is able to say what it was. The firm was for all practical purposes John D. Kremelberg. At an earlier date, he had dealt in cotton, petroleum, lard and other products, as well as tobacco, but prior to and after his death, he and his successors appear to have confined themselves chiefly to tobacco. The business required but few persons to conduct it— a manager under John and a few clerks. It had been successful because of John's ability and effort, coupled with his personal connections. If it retained its old *clientele* it was, no doubt, because George, the partner in the New York concern, with which it was intimately affiliated, was able, in a measure, to supply the place of his brother and continue the business without apparent change.

In the case of *Mullin* v. *Mullin, 96 Atl. Rep. 997,* Mr. Justice Swayze, speaking of the good-will of an undertaker's business,

uses this language: "The business of the decedent as distinguished from the tangible assets of the estate consisted only of such good-will as might attach to the name, 'Estate of Peter M. Mullin.' We think it doubtful whether in a business of that character consisting of personal services and evidently dependent largely, if not entirely, upon the personal characteristics of the individual, there could be any good-will even as late as four or five years after a man's death." If these remarks were true of Mullin's undertaking business, as the case shows it to have been conducted, *a fortiori* are they true of this commission business. If the new firm succeeded, continuous success was due, not to the name, but to the satisfactory way in which the tobacco was being bought for and shipped to European correspondents.

Mr. Tagart, at least, did not attribute any money value to the *name,* for he only charges himself "with deceased's interest in firm of Kremelberg & Company $19,577.91," a sum which, as I have said, represented the precise amount of accumulated profits left with the firm at John's death.

But whether the name had a money value or not, is quite immaterial, for it conclusively appears that the interests of the children were safeguarded and that they got all the benefit from it that they were entitled to.

At the time of John's death the capital consisted of the $19,577.91 just mentioned and of $32,000 which belonged to four of the children—$8,000 to each. There were two gentlemen who were chiefly concerned in its conduct under John, viz., Brancker and Martin. John's will, as I have said, gave all his interest to his son Frederick and his brother George. Frederick conveyed his share to George, who thus became the sole owner. As far as appears, he was not under the slightest obligation to give his own half to anyone; that he was under an obligation to declare a trust of Frederick's share appears only from the fact that he did so on the day on which Frederick conveyed to him. There was considerable argument on what was meant by the words of bequest "interest in the business houses." I have no doubt whatever that they included the accumulated profits; that Tagart thought so appears from the fact that he charged himself with them. It is hardly open to doubt that George intended to de-

clare a trust in respect of what had been bequeathed, and of that only. Before he declared the trust of May 4th, 1883, Messrs. Brancker and Martin had come into the business as partners. The agreement was that the $19,577.91 and the $32,000 should remain as capital; that the children of John should receive fifty per cent. of the profits; that Brancker and Martin should each receive fifteen per cent., and that he (George) should receive the remaining twenty per cent. Miss Ella Kremelberg, the second daughter of John, who became guardian of her younger sisters, and who acted, as far as necessary, for the family, so states. This is her testimony:

"Q. Was it your understanding that the members of your family become partners in the firm of Kremelberg & Co.?

"A. Yes."

Then after testifying that the agreement was that the children were to have one-half of the profits, plus six per cent. on the capital invested, she is asked:

"Q. At the time when you made the arrangement in 1883, do you recall as to what was to happen to the remaining fifty per cent. of the profits? Who was to get those?

"A. The other partners.

"Q. Who were those partners who were to get them?

"A. Mr. Martin, Mr. Engler and George. .

"Q. Who else?

"A. I imagine Mr. Brancker.

"Q. Then the arrangement at that time was that the children of John D. were to have fifty per cent. of the profits and that the three partners, J. George Kremelberg, Mr. Brancker and Mr. Martin, were to get the other fifty per cent. of the profits of the business?

"A. Yes.

"Q. Did you know in what proportion they were to get them?

"A. I do not remember at the time. I have heard it now.

"Q. Wasn't this the proposition; that your Uncle George was to get twenty per cent. and each of the other gentlemen were to get fifteen?

"A. I expect that it was."

Now, this was the arrangement made contemporaneously, or almost contemporaneously, with the execution of the trust deeds. Ella says, "Mr. Martin and Uncle George arranged it and they told us." It continued to be the arrangement from 1883 until

1895, when the children withdrew a part of their capital and made a new arrangement.

Complainants, disregarding the rest of the arrangement, put themselves on the trust deeds alone, but it is evident that these trust deeds were but a part of the entire transaction. They do not in the least conflict with it. In the deed of May 4th, 1883, George agrees to hold the one-half part of the property bequeathed to him in trust for the children:

"I paying to Messrs. Branker and Charles Martin each fifteen per cent. of the profits of said half part of the property devised and bequeathed to me as aforesaid and holding the other twenty per cent. thereof to my own use."

This harmonizes exactly with the arrangement testified to by Ella. As to Frederick's half, George had, in the December previous, agreed to hold *that* for the children in equal proportions. If it can be supposed that George then had in view the future conduct of the business, the deed itself makes no reference to it. Perhaps the details had not then been worked out. It is in nowise inconsistent with the arrangement actually made, viz., that in the case of this share, too, as in the case of the other, Martin and Brancker were each to have fifteen per cent. and George twenty.

It could hardly have been imagined that Martin and Brancker would come into the business as principals without suitable compensation.

There is another consideration which seems to have been overlooked in complainants' argument. There is nothing whatever to indicate that the gifts to Frederick and George were not gifts out and out. If John had intended a trust there was nothing to have prevented him from declaring it. He did not, and Frederick and George took absolutely. They generously surrendered to John's children a valuable interest worth over $50,000. In doing so they had the right to impose terms and conditions.

One of the underlying falacies of complainants' position consists in the assumption that the profits of the business made through thirty years were the fruit of the name and not of the

efforts and ability of those who carried it on. In a case circumstanced as this is, the name would at best serve only as an introduction, if introduction were necessary, to the one who had acquired it. Thereafter success, as I have said, would depend upon the business ability of its purchaser.

I have found that the trust deeds were put parts of one arrangement; but, if we consider them alone, the result would not be greatly different. George did not thereby undertake to continue the business and give John's children the profits. Nothing of this sort can be found in these papers. All that he undertook to do was to hold the interest bequeathed—that is, the capital and good-will as they stood at John's death, for the benefit of the children. He would have performed his whole duty had he called in or realized on the capital, including the good-will, if salable, and paid it over. Had he done so, it is absurd to suppose that the children would have received as much as they did receive. These children are now claiming, not only what George obtained for them, but on the basis of his gift, raise up a claim to that which he did not give. They affirm the arrangement as far as it has benefited them; they repudiate it as far as it has not given them all. They base their repudiation on the impossible notion that the profits have, for thirty years past, come solely from the good-will, a good-will which, if it had any value at all, had only an insignificant one and has long since ceased to exist. In any case the court would, after a lapse of thirty years, be reluctant to disturb a completed arrangement. Here there is nothing at all to provoke action.

I have not thought it necessary to mention or consider the changes in the partnership agreement. The first arrangement lasted for twelve years. Whatever changes took place afterwards were made after all the children had come of age and with their knowledge and consent.

The bill is devoid of all equity and should be dismissed.

*Mr. Chauncey G. Parker,* for the appellants.

*Mr. Francis Lafferty,* for the respondents.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Stevens.

*For affirmance*—GARRISON, SWAYZE, TRENCHARD, BERGEN, BLACK, WHITE, HEPPENHEIMER, WILLIAMS, TAYLOR, GARDNER—10.

*For reversal*—MINTURN, KALISCH—2.