CHARLES D. MAGEE, PLAINTIFF, RESPONDENT, v. MRS. IVA POPE AND THE ST. LOUIS UNION TRUST CO., (DEFENDANTS), APPELLANTS.— 112 S. W. (2d) 891.

St. Louis Court of Appeals. Opinion filed February 1, 1938.

Motion for Rehearing Overruled February 16, 1938.

Writ of Certiorari Denied April 21, 1938.

*S. C. Rogers* for appellants.

194

*Arthur Kreisman* and *W. E. Powell* for respondent.

HOSTETTER, P. J.—This is a suit in equity which was begun in the Circuit Court of the City of St. Louis on May 8, 1935, in which plaintiff sought to cancel a certain promissory note dated November 9, 1934, for $5000, payable in monthly installments of $83.331/3 each to the defendant, Mrs. Iva Pope, and to recover $249.99 paid thereon, on the ground that the said note was without any consideration.

The facts concerning the making and delivery of the note are substantially as follows: Dr. Charles H. Pope was a practicing physician in the city of St. Louis and maintained offices in Rooms 1889 and 1890, Railway Exchange Building, where he had an office practice which included making examinations for insurance companies. From time to time Dr. Pope had associates who looked after some of the insurance examinations and took care of patients when he did not care to serve, such as maternity, heart, ear, nose and throat cases, and on one occasion to look after his office practice while he was away on a vacation. Before such associations were permitted to make insurance examinations Dr. Pope asked the insurance companies permission to have such associates make examinations and to that end had such associates to complete regular application blanks furnished by the respective insurance companies, giving the qualification and experience of such associate, after which the insurance companies ran an inspection report for the purpose of ascertaining the professional, moral and financial standing of such associates and, upon finding them possessed of satisfactory qualifications, such associates were authorized by the insurance companies to make examinations. Among the associates of Dr. Pope was the plaintiff, Dr. Magee, who graduated from the St. Louis Medical School in 1925,

and, after his interneship, became an associate of Dr. Pope in 1927 or 1928. While associated with Dr. Pope the plaintiff completed the usual applications requested by the insurance company for whom he was to make examinations when Dr. Pope was not able to make them, and the usual inspection was had upon him after which he was duly appointed as examiner for such companies.

At one time the plaintiff, Dr. Magee, moved into adjoining offices to Dr. Pope in the same suite, with the understanding that Dr. Pope would refer to plaintiff a sufficient number of examinations to enable him to earn therefrom his office rental. This continued for some time and Dr. Pope having failed to refer to Dr. Magee sufficient examinations to permit him to earn his office rent, the latter finally moved his offices to Vandeventer and Shaw Avenues in another part of the city, where he maintained his own private practice as well as continuing to make examinations for insurance companies by whom he was authorized when Dr. Pope was not able to make such examinations. This procedure continued until Dr. Pope's sudden death, which occurred on Saturday, November 3, 1934.

In August of 1934 Dr. Pope left for a vacation and at that time had requested Dr. Magee to look after the insurance examinations and also to look after his office in the Railway Exchange Building.

Immediately after Dr. Pope's death, Dr. Magee communicated with Mrs. Iva Pope, his widow and one of the defendants herein, and asked if there was anything that he could do. Thereupon he was given several insurance examination blanks for which Dr. Pope had appointments for examinations, but which he had failed to make prior to his death. Dr. Magee being authorized by said insurance companies to make examinations for them, proceeded to make the same and on the following office day, Monday, November 5, he proceeded to the office of Dr. Pope as he had during Dr. Pope's absence on vacation in August, and on that same morning was approached by Mr. Van Vleet, brother of Mrs. Pope, and by S. C. Rogers, her attorney, and the latter advised him that "they wanted to sell him the business of Dr. Pope on the same basis as if he (Dr. Pope) was retiring from business" and suggested that the basis of compensation for such sale should be twenty per cent of all of the earnings from said practice for the succeeding five-year period. This suggestion did not appear satisfactory to Dr. Magee for the reason that such practice would be unethical and frowned upon by the medical profession. Thereupon, it was suggested that the price of $10,000 be paid for said practice, but this was also not satisfactory and nothing further was done on that day.

A day or two later Mrs. Pope called on Dr. Magee and asked $7500. This was also unsatisfactory to him and it was not until Friday, November 9, 1934, when Mrs. Pope again called on Dr. Magee and finally agreed to accept $5000 for the practice and good will

of Dr. Pope, that the proposition was satisfactory to him. Immediately upon the acceptance, Mrs. Pope said that she would have an agreement drawn up, and, shortly thereafter, returned with Mr. Rogers, her attorney, and presented to Dr. Magee a typewritten paper purported to be the agreement which Mr. Rogers had prepared and which she requested Dr. Magee to sign. Mr. Rogers suggested that he understood that he (Dr. Magee) was capable of handling Dr. Pope's business and that they were selling this business to him on the same basis as if Dr. Pope was retiring from practice. Thereupon Dr. Magee suggested that he would like to have his attorney look over the agreement, but Mrs. Pope said: "I wouldn't talk to an attorney because he knew so little about medical affairs." Thereupon Dr. Magee signed said note and delivered it to Mrs. Pope.

Then Dr. Magee purchased certain of the office furniture from the St. Louis Union Trust Company and Mrs. Pope for the sum of $196.06, for which amount he gave to said executors his promissory note, together with a chattel mortgage on the said equipment and said note was thereafter duly paid by Dr. Magee to the executors.

After the execution and delivery of the $5000 note, Mrs. Pope delivered the same to the St. Louis Union Trust Company as her collection agent for the purpose of collecting and receiving the payments thereon and crediting the same to her account in a living trust which she had set up. Dr. Magee made three monthly payments on said note, each in the sum of $83.33, but was unable to make any further payments, having lost considerable of the insurance examinations which Dr. Pope had, for the reason that the insurance companies had appointed additional examiners. Dr. Magee then talked with Mrs. Pope and told her of these facts and told her that he had ascertained that the practice and good will of Dr. Pope was not a saleable item and that he could not hold said practice, but Mrs. Pope refused to reduce the amount of the note and insisted upon the payments being made as agreed upon.

Thereupon Dr. Magee consulted counsel and upon their advice that the good will and practice of Dr. Pope was not a subject of sale after his death, he refused to make any further payments on said note and this suit was begun to cancel the note and prevent its sale to other parties and to recover judgment for the amount previously paid thereon.

The salient facts being set up in the petition, the relief prayed for was that both defendants, Mrs. Pope and the St. Louis Union Trust Company, be restrained by temporary order from transferring or negotiating said note until further order of the court, and, thereupon the court issued an order to each of the defendants to show cause why such temporary restraining order should not be made permanent.

Thereupon both defendants filed their separate answers and returns to the order to show cause and, after a continuance was had

from time to time by the court, during which time the restraining order remained in full force Mrs. Pope filed her amended separate answer to the order to show cause and also filed her answer and cross-bill. In the cross-bill she asked judgment for all the remainder of the installments not theretofore paid.

A stipulation was filed by the parties that the cause should be tried by the court on the order to show cause and on the merits at the same time. Thereafter the cause was heard by the court on January 13, 1936, on the plaintiff's petition, the amended separate returns to the order to show cause, answer and cross-bill of the defendant, Iva Pope, and the separate answer and return of defendant St. Louis Union Trust Company and the plaintiff's answer to the cross-bill of defendant, Iva Pope.

The court, after hearing all the evidence adduced, and the argument of counsel, took the cause under advisement, and thereupon found the issues in favor of the plaintiff, holding that the $5000 promissory note was void, having been given without any consideration.

The court further found that the plaintiff had made three monthly installment payments on said note, each in the sum of $83.33, or a total of $249.99 and further found that the note was negotiable and was held by the St. Louis Union Trust Company as collection agent for its co-defendant, Mrs. Pope, and that said defendants could, and would, likely, have negotiated the promissory note before maturity into the hands of an innocent holder for value, to the irreparable damage of plaintiff, by depriving him of his defense of want of consideration, which existed between him and Mrs. Pope, the original parties to the note, and that by reason thereof plaintiff had no adequate remedy at law.

The court further decreed that the promissory note be cancelled and for naught held and that defendants or either of them should deliver up said note to the clerk of the court for cancellation and that the temporary restraining order theretofore made be made permanent, and further decreed that the plaintiff have judgment against defendant, Mrs. Iva Pope, in the sum of $249.99, the amount theretofore paid by plaintiff to said defendant on account of said note, together with interest from the date of said decree at the rate of six per cent per annum and the court further adjudged and decreed that the plaintiff have judgment on the cross-bill of defendant, Iva Pope and that the costs of the proceedings be adjudged against the defendant Iva Pope and that plaintiff have execution therefor.

Said decree was entered by the court on April 13, 1936. Thereupon both defendants filed their separate motions for a new trial and in arrest of judgment, all of which was overruled by the court and, whereupon the defendants bring the cause to this court by appeal for review.

An effort was made on the part of defendants to show that the consideration for the giving of the note was something other than, or, in addition to, the sale of the practice and good will of the deceased doctor. It was shown that Mrs. Pope did have her brother send telegrams to the insurance companies, at some substantial expense to her, immediately after her husband's death, but she admitted that plaintiff's name was not mentioned in the telegrams and that they were sent prior to her making any deal with plaintiff about the practice and good will.

A few extracts from the testimony of Mr. Van Vleet, Mrs. Pope's brother, and from her own testimony, will illuminate the question as to what was regarded as the real consideration on which the note was based.

Mr. Van Vleet, addressing Mr. Rogers, his sister's attorney, said: "At the conference you did most of the talking; you told Dr. Magee you wanted to know what settlement was to be made whereby he would be allowed to go into the office and we thought that some settlement—we demanded quite naturally some agreement—Mr. Rogers, did, . . . and we said something like $10,000 or some basis of 20 per cent of the amount of the business that he did. . . . Q. Well, tell us what he was to sign any paper for. A. For the privilege of going into the Doctor's office and assuming the prestige of having the office in the Railway Exchange Building and having the good will of the Doctor's colleagues and that sort of thing. . . . Q. Consideration for what; a lump sum for what? A. For going into the office. Q. You mean have the privilege of going in and using the office? A. Yes. . . . Q. And then you understood the amount agreed upon would be for the right of Dr. Magee to succeed to Dr. Pope's prestige and ability? A. Now, Mr. Kreisman, providing you understand, of course, I didn't see the final arrangements. Q. The price to be paid was for the right to succeed to Dr. Pope's prestige? A. If you lay emphasis on the word 'prestige', I say no. Q. Well, for what? A. Well, to go into the building and take over the practice of an older doctor as Dr. Pope could handle it. . . . Q. And this $10,000 figure that was placed on this practice and good will, is that what you were talking about; about the $10,000 which you placed on it? A. That is what we wanted. . . . Q. Was there any reference at that time made to the sale of the Doctor's practice? A. Yes, there was. Q. Had you at that time also talked with Dr. Magee about the sale of the fixtures and personal effects in the office? A. Not to my recollection. . . . Q. Well, what was the arrangement he was to come in under? A. Understand, this was only tentative. I don't know anything about that. Q. Well, the tentative arrangement, what was it? A. As to his coming in, his moving into the office, that he should take over the Doctor's practice and business; some people had been accustomed

to coming to that office and he was willing just to continue in his footsteps, which were very lucrative. Q. In other words, do I understand at that time tentative arrangements were made for him to come into the office, continue in the footsteps of Dr. Pope and the amount to be paid was not agreed upon at that time? A. In substance that was right; however, it was decided that within a very few days a final arrangement was to be made, whereupon Dr. Magee was to pay a substantial sum. . . . Q. You thought it was a valuable business? A. I knew it was a valuable business. To my knowledge Dr. Pope had been practicing very close to 30 years. You see I have studied medicine myself and I knew it was lucrative, and that this Doctor's practice was very valuable was not only my own idea, but that of other doctors in town; I knew it was valuable and because of its great value I knew she should have a consideration for it. I knew that she had sold the practice to somebody; to my knowledge I know that it must have been so, else Magee would not be there.''

Extracts from Mrs. Pope's testimony: ''Q. Will you relate to the court as near as you can that conversation, at least the substance of it, Mrs. Pope? A. Well, I don't remember what was said on Monday very well, only we explained to Dr. Magee that he could not expect to come into Dr. Pope's office without some consideration. I said I didn't see why Dr. Magee should come into the office and go on with the work without some consideration, without paying some percentage or lump sum for coming in. The first amount, I remember, we said to Dr. Magee was $7500. Something had been said about percentage, on a percentage basis, so much on all the business that came into the office, into Dr. Pope's office, business that he took care of. . . . Q. Now, Mrs. Pope, how many examinations would the Doctor have, how much would they run, how much would they average? A. The average fee was three to five dollars and sometimes as low as one dollar, but that was for a group of children, however. The average fee was three to five dollars. . . . Q. Was that the purpose of the conference, of taking over the business of Dr. Pope? A. Yes, to take over the office. . . . Q. Did you tell Dr. Magee what you wanted, tell him you wanted him to handle the business and the office? A. I don't think—I didn't on Monday; my brother did. THE COURT: When you mention your brother did those things for you, was that done at your request and direction? A. Yes, sir. . . . Q. Now, anything else you claim to give Dr. Magee for his $5000, other than what you told Mr. Rogers? A. His good will and his privilege to come in there in preference to any other doctor, and the business I built up by those letters. Q. What, if anything, did you give Dr. Magee for this particular note of $5000? A. What I agreed to. Q. Well, what was that? A. To recommend all the patients to go to Dr. Magee that Dr. Pope had and to cooperate with Dr. Magee to hold the insurance business that Dr. Pope had at that

time, that he had worked 30 years to build up. . . . Q. Anything else? A. I don't remember, but I believe that is all I agreed to help him do, the good will of the office and practice. . . . Q. Well, was it your intention to sell the Doctor's practice for $5000. When I say the Doctor, I mean Dr. Pope's practice? A. Yes, that is what I am trying to think, if there is any way I can answer that question. A business built up over 30 years ought to be worth something, I should believe, that type of business. . . . Q. Now, Mrs. Pope, you expected this $5000 as compensation for the cooperation in addition, did you? A. Well, that office there. Q. Will you answer my question: whether or not the $5000 you received was to be in payment of your cooperation? A. No. Q. And you considered that $5000 was a reasonable price for the location? A. Yes, for everything. The $5000 was for my letting him come into the office? Q. Were there any calls between the time that Dr. Pope died and the time that this note was delivered to you by Dr. Magee? A. Yes. Q. And did you refer them at that time to Dr. Magee? A. I don't remember, because I didn't know whether Dr. Magee was going to buy the business; I think I told them to go there because he was taking care of the office at that time, I remember.''

Two other matters urged by Mrs. Pope as furnishing a consideration for the note was, first, the balance of the rent of the offices for November, and, second, for a certain book which she stated belonged to Dr. Pope which was left in Dr. Magee's office.

Dr. Magee testified that he had agreed with Mrs. Pope that he would pay the telephone bill from October 20, 1934, to November 20, 1934, and also that he would cancel his charge for several examinations which he had made in November for Dr. Pope, and for which he was not paid, but for which the estate of Dr. Pope received payment. From this it does not appear that either Mrs. Pope or Dr. Magee had ever considered the rent item a consideration for the note, but settled the same by a separate adjustment between themselves by giving each other credit for certain items. Mrs. Pope also admitted in her testimony that Dr. Magee told her to call for the book at any time she wanted it and she could have it.

Another matter urged as a possible consideration for the note, was the alleged use of Mrs. Pope's influence in obtaining for Dr. Magee the suite in the Railway Exchange Building which had been occupied by her husband. This, however, is dissipated because the record shows that she and the St. Louis Union Trust Company, as executors in charge of the estate of Dr. Pope, signed and mailed a letter to the manager of the Railway Exchange Building, notifying him that she would not be responsible for the rent of the suite after November 31, 1934, and also a letter from Dr. Magee to the said manager, advising him that he would be pleased to take over the suite and assume full responsibility for the rent beginning December 1, 1934.

It also developed in the testimony, given on behalf of defendants, that Mrs. Pope had been married to Dr. Pope about ten years at the time of his death; that she had accompanied him in making examinations of applicants for insurance at various appointed places; that in company with Dr. Pope she had attended conventions of medical examiners and officials of insurance companies and had entertained them at her home and danced with them and impressed them with her social graces, which tended to give her recommendation of Dr. Magee greater weight and greater influence.

It was also shown that she did instruct the elevator starter at the Railway Exchange Building and her maid to refer inquiring patients to Dr. Magee.

These kindly acts of hers may have been of some small infinitesimal service, but the fruits were necessarily fleeting and ephemeral and it does not appear from the testimony adduced that this service was included as a part and parcel of the sale she made to Dr. Magee. Indeed, her own testimony indicates to the contrary, and was to the effect that the practice and the good will of Dr. Pope enhanced by the long years of service in building it up and maintaining it, was the thing of great value which she sold to Dr. Magee and was the consideration on which the $5000 note was based. It thus appears affirmatively that all that was sold and conveyed, or thought of, at the time, as being sold and conveyed, by Mrs. Pope to the plaintiff, Dr. Magee, was the business and good will of the deceased Dr. Pope, and the question for us to determine is whether or not such business and good will constituted a valid consideration for the $5000 note to rest on.

The precise question involved in the instant case seems not to have been adjudicated by our Missouri courts. Industrious counsel on either side have failed to cite any Missouri decisions directly dealing with the identical question involved in the instant case, nor have we been able to discover any by our researches. So that, we must necessarily have recourse to the holding of the courts in other jurisdictions in order to determine in which direction the weight of authority tends.

The Supreme Court of Georgia in Ryman v. Kennedy, 141 Ga. 75, l. c. 76, 77, 80 S. E. 551, dealt with a similar question which involved the sale of a deceased lawyer's business for $2,500 for which the purchaser had executed a promissory note. The maker of the $2500 note brought suit to cancel the note and to recover all sums which had been paid thereon, on the ground that the thing which the widow of the deceased lawyer attempted to sell was not a subject-matter of sale and that the note was without consideration. The court, in ruling in favor of the maker of the note, used the following language:

"Fees earned but not collected by the testator prior to his death, and all choses in action belonging to the testator in connection with

his law business at the time of his death, and pending claims which the party of the first part had made arrangements with other attorneys to handle, were expressly excluded from the sale, and nothing was left upon which the contract could operated. The professional skill of the testator, as a lawyer, entered into the contract of employment by his clients, and the possibility that after his death his clients would consent to the selection of other counsel by the executors or others, is too remote a contingency to render the 'good will' of the testator a subject matter of sale. [Civil Code, secs. 4117, 4953.] The 'law business' by the reservation contained in the contract, was stripped of its substance, and there was no consideration whatever to support the contract.''

In In re Caldwell's Estate, 176 N. Y. Sup. 425, 107 Misc. 316, the court held as follows:

''The business of a physician who specialized in X-ray pictures as an aid to physicians, and who had a high reputation in his specialized field, and had made many improvements and inventions in the art, had no 'good will,' transferable after death, and subject to transfer tax, since any good will was personal to the physician, and not to the place of business, etc.''

In the course of the opinion the court, l. c. 427, uses this language:

''But after a man who has acquired a reputation for great skill or knowledge is dead, persons who would go to his office for the purpose of consulting him and availing themselves of his superior skill would not go there merely because the office was still open and occupied by another person, who had no reputation for superior knowledge or skill.''

In Mandeville v. Harman, 42 N. J. Eq. 185, l. c. 193, 194, 7 A. 37, the court, in discussing a question similar to that involved in the instant case, uses the following language:

''Professional skill, experience and reputation are things which cannot be bought or sold. They constitute part of the individuality of the particular person and die with him. There can be no doubt, I think, that if the complainant was the most distinguished physician of the city of Newark, and had by far the most lucrative practice in that city, and he should be so unfortunate as to die next month, or next year, it would be impossible for his personal representative to sell his good will or practice, as a thing of property, distinct from the office which he had occupied prior to his death, for any price, and I think it is equally obvious that if it were sold in connection with his office, the only possible value which could be ascribed to it would be the slight possibility that some of the persons who had been his patients might, when they needed the services of a physician, go or send there for the next occupant of the office. The practice of a physician is a thing so purely personal, depending so absolutely on the confidence reposed in his personal skill and ability, that when

he ceases to exist it necessarily ceases also, and after his death can have neither an intrinsic nor a market value. And if the complainant should make sale of his practice in his lifetime, it is manifest, all the purchaser could possibly get would be immunity from competition with him, and perhaps his implied approval that the purchaser was fit to be his successor, but it would be impossible for him to transfer his professional skill and ability to his successor, or to induce anybody to believe that he had.''

In McFarland v. Stewart (Pa.), 2 Watt 111, l. c. 112, 26 Am. D. 109, the court says:

''In the case of an innkeeper, the advantages of the stand would belong to the heir as an incident of the realty; and in the case of a lawyer or physician, the expectation of practice as a personal incident of professional reputation for skill, would be extinguished by the death of the party. Such advantages then are too ephemeral or indeterminate to be the subject of separate and specific ownership.''

In Wightman v. Wightman, 223 Mass. 398, l. c. 402, the court uses this language:

''As stated by Braley, J., in Foss v. Roby, 195 Mass. 292, at page 297, in 'the practice of dentistry, the personal qualities of integrity, professional skill and ability attach to and follow the person not the place.' [See Moore v. Rawson, 199 Mass. 493; Hutchinson v. Nay, 187 Mass. 262.]''

In the case of Kremelberg v. Thompson, 87 N. J. Eq. 655, l. c. 659, 103 A. 523, the court says:

''The good will of the business of a commission merchant, originating with himself and carried on without fixed capital for 15 or 20 years, would seem rather to resemble that of. a doctor or lawyer than that of a retail merchant.''

In Rakestraw v. Lanier, 104 Ga. 188, l. c. 198, 30 S. E. 735, 65 Am. Stat. Rep. 134, the Supreme Court of Georgia, speaking through Judge Little, uses this language:

''I can readily perceive that a successor of a merchant, broker, or shopkeeper might reasonably expect to retain the former patronage of the place of business, but fully concur with the views expressed by the court, in the case of Mandeville v. Harman, supra, that professional skill, experience, and reputation are things which cannot be brought or sold. They constitute part of the individuality of the particular person, and die with him. In that case the court said: 'There can be no doubt, I think, that if the complainant was the most distinguished physician of the city of Newark, and had by far the most lucrative practice in that city, and he should be so unfortunate as to die next month or next year, it would be impossible for his personal representative to sell his good will or practice, as a thing of property distinct from the office which he had occupied prior to his death, for any price; and I think it is equally obvious that, if it

were sold in connection with his office, the only possible value which could be ascribed to it would be the slight possibility that some of the persons who had been his patients might, when they needed the services of a physician, go or send there for the next occupant of the office. The practice of a physician is a thing so purely personal, depending so absolutely on the confidence reposed in his personal skill and ability, that when he ceases to exist, it necessarily ceases also, and after his death can have neither an intrinsic, nor a market value. And if the complainant should make sale of his practice in his lifetime, it is manifest all the purchaser could possibly get would be immunity from competition with him, and, perhaps, his implied approval that the purchaser was fit to be his successor; but it would be impossible for him to transfer his professional skill and ability to his successor, or to induce anybody to believe that he had'.''

In 28 C. J., p. 731, sec. 3, the following appears:

''Good will exists as property merely as an incident to other property rights, and is not susceptible of being owned and disposed of separately and apart from the property right to which it is incident. Good will may be attached to the particular place where the business is conducted; it is not, however, necessarily dependent upon locality, and it may adhere to some other principal thing, such as the reputation acquired by an established business, the tangible assets of a trade, the right to use a particular name, trade-mark, or valuable trade secret. It seems, however, that good will does not adhere to a business or profession dependent solely on the personal ability, skill, integrity, or other personal characteristics of the owner.'' Citing the following cases: Sheldon v. Haughton, 21 F. Cas. No. 12,748, 5 Blatchf. 285; Witkowsky v. Affeld, 208 Ill. App. 198; Moore v. Rawson, 199 Mass. 493, 85 N. E. 586; Foss v. Roby, 195 Mass. 292, 81 N. E. 199, 10 L. R. A. (N. S.) 1200, 11 Ann. Cas. 571; Masters v. Brooks, 132 App. Div. 874, 117 N. Y. S. 585; McCall v. Moschowitz, 14 Daly, 16, 1 N. Y. St. 99, 10 N. Y. Civ. Proc. 107; Holden v. Mc-Makin, 1 Pars. Eq. Cas. 270; Slack v. Suddoth, 102 Tenn. 375, 52 S. W. 180, 73 Am. St. Rep. 881, 45 L. R. A. 589; Farr v. Pearce (Eng.), 3 Madd. 74, 56 Reprint 437.

In 28 C. J., p. 734, sec. 4, the following appears:

''Although the sale of a business dependent solely upon the personal ability, skill, or integrity of the owner, may be valid, if the owner dies without disposing of it the good will dies with him.''

Citing the following cases: Ryman v. Kennedy, 141 Ga. 75, 80 S. E. 551; Rakestraw v. Lanier, 104 Ga. 188, 30 S. E. 735; 69 Am. S. R. 154; Kremelberg v. Thompson, 87 N. J. Eq. 655, 103 A. 523; Mandeville v. Harman, 42 N. J. Eq. 185, 7 A. 37; Matter of Caldwell, 107 Misc. 316, 320, 176 N. Y. S. 425 (Aff. 188 N. Y. S. 921, Mem.); McFarland v. Stewart (Pa.), 2 Watts 111, 26 Am. Dec. 109.

Much stress is laid, by counsel for defendants in his brief, and by Mrs. Pope and her brother in their testimony, on the advantage enjoyed by Dr. Magee in obtaining the same office quarters in the Railway Exchange Building which had been occupied by Dr. Pope. As pointed out hereinbefore, it does not appear that Dr. Magee, in renting the offices formerly occupied by Dr. Pope, was indebted to the activities of Mrs. Pope in any manner in renting them, but it does appear that he secured the offices by his business arrangement with Mr. Ricketts, manager of the Railway Exchange Building, after Mrs. Pope and her co-executor had notified Mr. Ricketts by letter, dated November 16, 1934, as follows: "I hereby notify you that due to the death of my husband, Dr. Charles H. Pope, I can no longer be responsible for the rent of suite 1889-1890 Railway Exchange Building after November 31, 1934," thereby giving to the month of November an extra day.

However, as pointed out in many of the authorities hereinbefore cited and quoted from, where the good will of a business is based solely on the professional skill, personal ability, integrity, high standing, learning and acknowledged repute of the owner, then such good will is not dependent on any particular place or locality. These qualities are not transmissible and when the owner, who possesses these traits, dies, the qualities he possesses—the good will, is "gone with the wind," if we may use the title of a popular Civil War story.

In giving such stress and prominence to the securing of the offices by Dr. Magee, which the deceased Dr. Pope occupied, we opine that Mrs. Pope and her counsel have overlooked the kernel of truth contained in certain lines, usually ascribed to Emerson, but which were tenaciously claimed by Elbert Hubbard, the literary genius who went down with the Lusitania under the attack of a submarine during the World War, which run as follows:

"If a man write a better book, preach a better sermon, or make a better mouse-trap than his neighbor, though he build his house in the woods, the world will make a beaten path to his door."

Our Supreme Court of Missouri, in Sessinghaus Milling Company v. Hanebrink, 247 Mo. 212, 152 S. W. 354, has given expression to some views in respect to damage to the good will of a milling company, a going concern, engaged in the manufacture and sale of flour. The milling company brought suit aginst its alleged unfaithful president and general manager for damages, for making secret profits for himself by selling inferior grades of flour "as and for" its highest grade, thereby damaging its business, reputation and good will. In holding that the petition, containing these allegations, stated a good cause of action, the Court said (l. c. 222):

"The good will of a business is property which the law protects and for injuries to it damages may be recovered."

In 28 C. J., p. 737, sec. 7, it is stated in the text that good will being property, ''on the owner's death ordinarily becomes a part of his estate.''

Now, applying these principles to the facts of the instant case, even if the good will, attached to the business of Dr. Pope as alive, practicing physician, which was based on his superior learning, skill, ability, personality, reputation and acknowledged prestige, survived him and continued to exist after his decease, then it became a part of his estate, in which even Mrs. Pope as an individual had no right to sell it and Dr. Magee acquired no title to it as a purchaser from her.

Defendants make the following eleven assignments of error, viz: The trial court erred in issuing the temporary restraining order against the defendants; in assuming jurisdiction under the facts pleaded in plaintiff's petition; in admitting any evidence against defendant St. Louis Union Trust Company for injunctive relief, and on the merits, over its objection; in admitting evidence offered by plaintiff over the objection of defendants; in excluding evidence offered by defendants; in finding for plaintiff against St. Louis Union Trust Company for injunctive relief and on the merits; in finding for plaintiff against defendant Mrs. Pope for injunctive relief and on the merits; in its finding for plaintiff against Mrs. Pope on her cross-bill or counterclaim; in making and entering its judgment on the pleadings and evidence; in overruling defendants' motion for new trial, and each of them; in overruling defendants' motions in arrest of judgment, and each of them.

Many of these assignments of error are perfunctorily made and are repetitions and overlapping and are not briefed, and, therefore, are properly considered as abondoned.

It is strenuously urged by counsel for defendants that plaintiff was not entitled to injunctive relief, as he had an adequate remedy at law. It is further contended that there are no sufficient allegations in the petition which would justify the granting of equitable relief. We are unable to agree to this contention. The petition set out the facts in respect to the giving of the note in controversy; that it was without any consideration; that three payments had been made thereon; that unless restrained the note could be, and likely would be, transferred to an innocent purchaser, a holder in due course, before maturity, thereby depriving plaintiff of his defense of want of consideration, which defense existed as between the parties to the instrument; that he has no adequate remedy at law; that he will suffer irreparable injury and damage by being deprived of his defense of want of consideration; that the note is in the physical possession of her co-defendant, the St. Louis Union Trust Company, for collection.

We think there is no merit in the strictures against the petition. Neither do we find any merit in the contention made on behalf of the

trust company, who had physical possession of the note, and we think it was properly included in the suit and that it was eminently proper for the restraining order to be leveled against the trust company as well as against Mrs. Pope. However, we might say that the trust company has no ground for complaint, which it urges for being included in the suit, and for the restraining order being made against it as well as Mrs. Pope, as no judgment for costs was made against it, but only against Mrs. Pope.

Equity has jurisdiction to enjoin the transfer, and to order the cancellation of, a negotiable instrument, on grounds which, as between the original parties would prevent its enforcement, when, as between the maker and a transferee, who is a holder in due course, the maker would be deprived of his defense of want of consideration, as exists in the instant case. [32 C. J. 42, 152, 153.]

We are unable to agree with counsel for defendants that plaintiff had an adequate remedy at law, even if no injunctive relief had been given. True, if Mrs. Pope had sued him on the note he could set up his defense of want of consideration, but she could dismiss her suit and later reinstate it, and so on. He had no power to force her to bring suit and try out the issue. After he found out that the good will be purchased from Mrs. Pope was a "delusion and a snare" and the results barren, and procured information from counsel on the subject and advised Mrs. Pope that he would make no further payments, she, according to his testimony, became very angry and denounced him as being "yellow."

Complaint is made by counsel for defendants that error was made by the trial court in the admission and exclusion of testimony. In the exclusion of testimony tendered by defendants we find that no offer of what the excluded testimony would be, was made. However, this being an equity case, the reviewing court has the right and power to disregard improper admission or exclusion of testimony, if it finds that such testimony would not affect the conclusion arrived at by the court on the evidence properly adduced and upon our investigation of such claimed errors we find that no errors charged against the trial court, in the admission or exclusion of testimony, could have had any influence in causing the court to have reached any conclusion other than the one it did reach. [Lowe v. Montgomery, 321 Mo. (*in banc*), 11 S. W. (2d) 41; Pfotenhauer v. Ridgway, 307 Mo. 529, 271 S. W. 50; Rinkel v. Lubke, 246 Mo. 377, 152 S. W. 81.]

We are of the opinion that the learned trial judge reached the proper conclusion and that the judgment rendered in the circuit court should be affirmed, and, it is so ordered. *Becker* and *McCullen, JJ.*, concur.