RAÚL YUMET CHACÓN ET AL., Petitioners, *v.* SUPERIOR COURT OF PUERTO RICO, AGUADILLA PART, WILLIS RAMOS VÁZQUEZ, JUDGE, Respondent; ANGELINA YUMET PIZÁ, Intervener.

No. 2182. Resubmitted December 11, 1957.—Decided September 8, 1958.

658

*Enrique Báez García* for petitioners.  *García Méndez & García Hermida* and *Benjamín Ortiz* for intervener.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

Ángel M. Yumet died intestate in Aguadilla on June 11, 1949. He was succeeded by six legitimized sons who are full brothers, his widow, and an acknowledged natural daughter, Angelina Yumet, the intervener herein. The widow died shortly thereafter leaving as sole heirs her sons begotten by the predecessor in interest, and, by agreement or consent of the heirs, Jorge Yumet, one of the heirs, was designated administrator or representative of the estate. Approximately two and one-half years thereafter the intervener applied to the Aguadilla Part of the Superior Court for a judicial administration, which was decreed and Lic. Luis A. Rosario was appointed administrator.

With the intervention of the interested parties, the administrator made an inventory of the inheritance of the estate pursuant to § 568 of the Code of Civil Procedure (1933. ed.), which he. filed on December 4, 1952. That inventory included personal and real property worth $355,408.34, including cash money and deposits in banks totalling $40,629.09; office furniture valued at $450, and an item described by the administrator as follows: "Commission business, sales agency of sugar, rice, pork products, and other articles of commerce" —$45,000. The opposing heirs in the judicial administration, the petitioners herein, accepted the said inventory and value of the estate with the exception of the $45,000 item representing the commissions and sales agency, which they challenged at all times as nonexistent.

A hearing was held in the Superior Court on February 12, 1953, with the intervention of the parties. During the hearing the judge announced that evidence would be heard "in order to determine whether the predecessor in interest, Ángel M. Yumet Méndez, was a merchant or a broker." The heirs maintained that the business was a personal relation or representation of the predecessor in interest which was extinguished by his death, while the intervener alleged the existence of a business which had passed to the estate. For the purposes announced, she offered the following evidence:

Arturo Hernández, · cashier of Central Coloso, testified that he knew the predecessor in interest as a broker and merchant and, according to the records of the Central, that Yumet placed orders for sugar which he sold in the market; that after his death business was transacted in the name of Ángel M. Yumet, Sucesores, and signed by Jorge Yumet; that according to his knowledge, the predecessor in interest did not have a commercial establishment at the time of his death; that Yumet had owned a store more than 20 years ago and that he knew of none other, and that he transacted business in his house; that the sugar

purchased by the predecessor in interest remained in the Central and that he gave orders to deliver the same to different persons; that the Central issued checks to Yumet for commissions on the basis of the volume of sales made during the month—an allowance of 1-½ per cent commission; and that the Central billed directly to Yumet, who paid for the sugar. The witness identified orders and invoices covering the transactions made by the predecessor in interest with Central Coloso, which were admitted in evidence. All those orders were placed with the Central to deliver directly to certain persons or business firms certain amounts of sacks of sugar. The invoices for the amount of the sugar thus delivered were made in the name of the predecessor in interest.

The testimony of Ramón H. Vargas, who testified that at one time he had done business with Yumet, tended to prove that the latter was engaged in operations proper to a wholesaler and retailer who purchased, stored, and sold, and proper also to a representative or commercial agent who took orders for products, mainly rice, and placed them for delivery, earning what the witness termed an overprice. He testified that the predecessor in interest was a rice expert, and that on certain occasions he would erase the basic price of the products fixed by the producer and reported a higher price, thereby making a profit by overcharging the customer in addition to the commission which he received from the mill. He also testified that Yumet loaned money to the merchant in order to place the orders or requisitions, charging an additional interest thereon. It appears from his testimony, however, that the operations transacted by the predecessor in interest, typical of a wholesaler or retailer, were transacted long before his death.

Gilberto Veray, manager of the Banco Popular de Aguadilla, testified that he knew Yumet to be a merchant who was engaged in the business of loans and commissions; that the bank handled the collection of the drafts drawn by the pre-

decessor in interest to the account of others and his personal drafts; that he paid and was paid by check; that he purchased and sold in his name and sold in the name of other persons, and that he did not own any establishment. He had an office and transacted rice and sugar operations by mail and through the bank.

The intervener called the administrator, Lic. Luis A. Rosario, as witness. He testified that he knew Yumet as a merchant and commission agent; that he had verified that the predecessor in interest used to place orders for sugar with Central Coloso which he paid out of his own money, and that the Central delivered the sugar to the persons named in the order and billed directly to the predecessor in interest, who was paid a certain rate of commission on the total volume of sales. The administrator testified that he did not have before him any book or other evidence of the accounting of the business of the predecessor in interest, with the exception of a book of loans, cancelled checks, drafts, and stubs of the checks drawn by him. At his request and that of the intervener, and over the objection of the other heirs, the court ordered at the hearing the appointment of an accounting firm to submit a detailed report of all the property left by the predecessor in interest. (Tr. Evid. 311, 313, 319). To that end, it entered a written order on February 18, 1953, appointing the firm Pol, Toro, Gil y Compañía to submit a report to the court, through the judicial administrator, "on the entire assets and liabilities left by the predecessor in interest, Ángel María Yumet Méndez, at his death."

Accountants Emiliano Pol and César E. Rodríguez appeared at the second hearing held on June 12, 1953, and asserted time and again that, because of the lack of accounting books and of other necessary information which had not been furnished to them, they would be unable to submit a complete and full report which would be worthwhile and of some use or benefit to the court and to dispose of the case,

and that the evidence in their possession was insufficient to say whether the business was carried on a "commission" or a "commercial" basis. In answer to rather hypothetical questions of expert character, Pol testified that in a business such as that transacted by the predecessor in interest *it was permissible* to keep subsidiary accounting books and records such as a ledger, general journal, cash or collections book, disbursement register, checks register, and other similar accounts. Accountant César E. Rodríguez asserted that they did not have any accounting books which would show details of the business of the predecessor in interest up until his death, with the exception of a loan book prior to his death and another subsidiary book which covered the period of time up to 1952; that they could not determine the business of Yumet, and that without any other evidence they could not render an enlightening report to the court. He admitted that he had in his possession the stubs and cancelled checks of the predecessor in interest from 1948 to 1949, correctly reconciled with the bank, and also 1947 checks which had not as yet been examined. It appears from the record that prior to this hearing the accountants had received the original invoices from Central Coloso and Central Guánica for the years 1948 and 1949, as well as the statements of commissions from other firms covering the same period. According to their testimony, they had not investigated at those sources, or in the banks, or with the persons and entities with whom the predecessor in interest did business, notwithstanding the fact they needed that information, alleging that that was a detailed, tedious, and long task which would take time. There is no record that such investigation was made subsequently.

Jorge Yumet testified at that hearing that he had delivered all the books and documents in his possession to the administrator and to the accountants; that the predecessor in interest did not keep the accounting described by the latter; that his father prepared his own income-tax returns and kept

his own accounts; that he did not have a bookkeeper or employees, and that the only existing book was a book of loans because he needed to keep a record therein for several years, while in the commission business the invoice itself showed who received the money as well as the amount; that the predecessor in interest had an office in his own residence and did not operate a store, and never kept an accounting system. The heirs moved to relieve the accountants from the preparation of the inventory which had been entrusted to them, since they had stated that they were unable to comply therewith because of the lack of data. Thereupon the judge denied the motion. (Tr. Evid. 382.)

On June 24, 1953, the court entered an order in which, after referring to the hearing of June 12, it stated as follows:

"After considering those motions on the merits and upon the evidence presented, *we must conclude* that Ángel M. Yumet Méndez *kept in his business a complete set of accounting books* which according to the accountants comprised a general ledger, a general journal, a cash and collections receipt book, and a disbursement register, which, together with other papers, data, and documents required by them and which appear from the motion of the judicial administrator of May 28, 1953, and with which all the interested parties are acquainted, it must absolutely be produced in order that they be able to promptly carry out their commitment. . . . Considering all the circumstances of this case, the court decides to grant and hereby grants to the opposing parties a period of 10 days within which to procure and deliver to the accountants Pol, Toro, Gil y Compañía, the books and documents requested, and the latter shall have a period of 30 days after such delivery to submit their final report to the court.

"In the event the opposing parties *fail to deliver* the documents in question within the aforesaid period, it is ordered that the said accounting firm Pol, Toro, Gil y Compañía proceed, by *all supplementary means* within its reach, to procure all the information needed to enable them to submit to the court as soon as possible the report required of them."[1] (Italics ours.)

---

[1] Because of the effect on the decision of the case, it is well to say that the findings of fact made by the respondent court in the preceding

On March 8, 1954, approximately nine months thereafter, the accountants were required to submit their report within a period of 30 days, advising them that in the event of failure to comply within such period "the court will proceed to formulate the inventory without the benefit of such report and, therefore, it will not authorize the payment of fees to such accounting firm." On June 1, the administrator submitted the report of the accountants. That report does not appear in the record, but by reference thereto we know that it contained the $45,000 item which was included in the inventory originally filed.[2]

The court ordered that a final inventory be filed for the purposes of the report of the accountants, which was submitted on December 14, 1954. The $45,000 item was now increased to $142,810, and in order to account for the increase, the administrator enclosed a letter from the accountants dated November 30, 1954, which was subsequent to the report submitted by them, which in its pertinent part reads as follows:

"With reference to your letter of November 15, which was received yesterday in this office, we beg to inform you as follows:

"Although *the business books* of Ángel M. Yumet Méndez *have not been furnished to us* at any time, with the exception of the subsidiary loan book, we have concluded from our inves-

order are not supported by the record. It does not appear from the oral evidence given at the hearings of February 12, 1953 and June 12, 1953, or from other written records, that the predecessor in interest kept any accounting books, nor, specifically, those mentioned, with the exception of a loan book. The evidence conclusively shows otherwise. The testimony of the accountants, which was of an expert character in this respect, was in the sense that a business such as that of the predecessor in interest called for an accounting system and for the books described by them; however, they did not testify, and apparently had no knowledge to so testify, that such books were kept and that, as a matter of fact, they actually existed.

[2] In petitioners' brief, part of the report is transcribed as follows:

"COMMISSIONS AND SALES AGENCY BUSINESS

"From the books and other records available, we have been unable to determine the value of the business at the death of Mr. Yumet on June 11, 1949.

"Should this Hon. Court deem it advisable, a capitalization could be

tigation that, by the manner in which this business was operated, at the date of the death *there should be* several assets which constituted *the capital* of the business.

"Since it is impossible to submit exact figures, we confine ourselves in our report to recommend a method for estimating this *capital,* which is generally accepted. It is obvious that in the absence of certain data, an estimate made by the accepted methods is the only reasonable alternative. For this reason, we believe that you should use that method in order to reach a reasonable valuation *of the capital necessary* to operate the business of Ángel M. Yumet Méndez.

"In the ordinary course of business it occurs frequently that a business is worth more than what the records show. When the time to sell comes, there arises the problem of its valuation. In order to meet this need, the method of capitalization of profits has been put in use. This method provides for the determination, on the basis of the average profits for past years, of the capital necessary to produce such profits at the normal rate of yield in that kind of business.

"Taking as a basis in this case the profits from sugar reported on the income-tax returns, we would obtain the following figures:

*Year*

| | | | | |
|---|---|---|---|---|
| 1947 | | | | $7, 890. 20 |
| 1948 | | | | 6, 087. 77 |
| 1949 | $3,303.75 ÷ 162 days at $20.393 | $3,303.75 | | |
| | 203 days at 20.393 | 4,139.78 | 7, 443. 53 |
| | Total for three years | | | $21, 421. 50 |
| | Yearly average | | | $ 7, 140. 50 |

"Taking as a basis a yield of 5 per cent, then a capital of $142,810 would be necessary to produce an average profit of $7,140.50.

"In taking this valuation as a basis, the statement of assets and liabilities shown on our report should vary as follows:

"Where it reads Value of the Business, the amount of $45,000 should be substituted by $142,810. The total assets

made by taking as a basis the average net income from the business during the past three years, at the rate of 5 per cent net profit.

"In the meantime we have taken, for the purposes of our report, the valuation of $45,000 determined by the judicial administrator in his inventory of December 3, 1952, which was submitted to this Hon. Court."

would then be increased to $491,859.15. The hereditary estate would total $478,466.02."

. The final inventory was approved over the objection of the heirs to the item of $142,810, which was included therein. In view of the fact that the controversy centers fundamentally on the question *of fact*, it is necessary to set forth the findings of the respondent court on which it based its final determination: .

"The preparation of a draft of final inventory has been a very difficult task in this administration, which has been the subject matter of much controversy from its commencement. In order to form an idea of the conflict of interests existing herein, it would suffice to mention that substantial properties are in conflict; that there are six brothers who have joined to oppose the interest of a sister, as petitioner, who has alleged serious irregularities; that properties consisting of substantial sums in cash, real property, rights and actions, loans and mortgage credits were omitted, properties conveyed in the name of other persons but which actually belonged to the predecessor in interest. It is further alleged that the majority of those properties were separate property of the predecessor in interest but which appeared as community property to the prejudice of said petitioner, who, it is well to say, was an acknowledged natural daughter, while her six brothers were natural children begotten by another mother and legitimized by the subsequent marriage of the parents.

. . . . . . . .

"The *accountants were unable to obtain from the opposing parties the accounting and information necessary to fulfill their commitment*. The judicial administrator sought from this court adequate relief, and the court, by order of May 28, 1953, set June 12, 1953, for the hearing of various motions. The parties and the accountants were heard, and the court finally entered an order on June 24, 1953, from which we extract, so as not to elaborate further on this order [order commented by us in n. 1 *ante*, p. 663]:

"It appears from the record of this case that the only books which coheir Jorge Yumet submitted to the accountants were the following:

"1.—A subsidiary ledger of outstanding loans showing loans made by Ángel M. Yumet Méndez during the period from August 30, 1928 to June 11, 1949.

"2.—A general ledger of operations of the Heirs of Ángel M. Yumet Méndez as of June 11, 1949.

"3.—A general journal of the Heirs of Ángel M. Yumet Méndez wherein operations were entered as of June 11, 1949.

"It will be seen that the first book is the only book covering the operations made during the life of the predecessor in interest Yumet Méndez. The other two were first kept by co-heir Jorge Yumet following the death of the predecessor in interest and they comprise his estate. Inasmuch as it is sought to determine the properties and debts of Yumet Méndez at his death, it is clear that the books which could shed more light are those comprising his operations until that time. The books comprising his estate would not include any *assets, data, and information which it would be desirable to conceal,* and, therefore, they are not so important.

"We know that in every accounting system there should be kept at least two books or principal registers, to wit: a general journal and a general ledger. The general journal contains entries of the operations of the business in chronological order, so that this register is like an orderly history of the life of the business. However, this chronological statement of the operations would be of no value for the purposes of measuring the financial condition of the business and the result of the operations.

"In order to interpret the financial condition referred to, it would be necessary to classify the information by items and to group them into what accountants call 'accounts.' This is where the general ledger comes into play, because this record consists of the 'accounts,' to wit: cash accounts, accounts receivable, inventories, furniture, houses and lots, outstanding mortgages, accounts payable, purchases, sales, general expenses, and other items included in the denomination of 'accounts,' make up the general ledger. It is generally known that each item is posted separately in the general ledger. From the journal where the transactions are entered in corresponding order, the operations are then posted in the ledger entering the information under the corresponding account. In the ledger is noted the folio of the journal where the original entry was

made, and in the journal is noted the folio of the ledger in which each transaction is posted. These numbers are noted under a column called folio, and they serve to facilitate the search of information.

"According to the record, *neither the general journals nor the ledgers nor the cash and collections receipts nor the disbursement registers* nor any other data and documents referred to in our order of June 24, 1953, *were delivered to the accountants.* In order to determine the assets and liabilities of the predecessor in interest at his death, only a subsidiary ledger of oustanding loans was submitted, but it may be easily seen that only a member or part of an accounting system was delivered. *What apparently was done in this case was to dismember an accounting system and to submit only a member or part thereof, alleging it to be the whole system.* It is as if in a criminal case in which the body of the deceased is not found, after a careful search someone would deliver to the prosecuting attorney an arm of a human being and say, 'Mr. Prosecuting Attorney, here is the body you are looking for'; and the prosecuting attorney would ask, 'And the rest of the body, where is it?,' and he be answered: 'There is no rest and there never was any; this human being is and always was this arm.'

.      .      .      .      .      .      .      .

"*Why do these books of the predecessor in interest do not appear?* Of this we can speak only on the basis of conjectures, but in pondering over the matter we shall see that the *journal, being a book of original entry,* contained *in chronological order all the transactions made;* that this record constitutes a careful and detailed history of the business, *and that if it had been submitted to the experts,* it would have been easy for them to reconstruct the entire assets and liabilities of Ángel M. Yumet Méndez at the date of his death.

"Furthermore, and assuming that this book was the only one in existence, it may be observed that all the accounts of income and expenses included in the figures which were reported on the income-tax returns are missing. This is so because the income and expenses are entered in the general ledger and not in a subsidiary book of accounts receivable, which is the only book submitted for this period. *We have therefore verified that the book presented is but a member of a major system, the other parts of which have not been presented.*

"What did the journal and ledger contain that they were not submitted? These books contained the entries of all the income from the business, which was also dismembered from the inheritance property as of the death of the predecessor in interest Yumet Méndez. *The cash operations were also entered,* and of this we only know what we learned from the inventory of the properties made by Jorge Yumet for delivery to the Bureau of Inheritance Taxes a few months after the death of Yumet Méndez.

"It is significant to observe that the only properties transferred to the estate are the loans recorded in this book in addition to the real property, *which is another reason for not presenting the other books which would have shown all the properties,* those segregated *and those withheld,* if any. *And if none were withheld,* would it not have been wiser and clearer to present the general ledger showing all the properties and prove that these were the same properties which were thereafter transferred to the estate?

"The accountants have rendered their final reports despite the fact that they were not furnished with all the information required by the court, *nor with the accounting books kept by the predecessor in interest,* not only in the opinion of the petitioner but it so appears clearly from the scant records and conventional books furnished by coheir Jorge Yumet to the accountants. (See, in this connection, pages 2–7 of the original report of experts Pol, Toro, Gil y Compañía.)

"The lack of these books necessarily compelled the experts to resort to the elementary procedure of making an inventory of these properties and to determine their veracity as far as possible.

"The evidence submitted, all of which is fundamentally affirmative in character, supports the existence of a business owned by the predecessor in interest, of which the hereditary estate was responsible both at law and in obligations, a business which obviously constituted the principal source of income of the predecessor in interest and which coheir Jorge Yumet took over for his own benefit after the death of his father. The administrator and the accounting experts recommend the approval of the item of $142,810, at which they valued the business, which they consider a fair and reasonable amount. The method employed by the experts convinces the court that

this item should not be eliminated. There is nothing in the record to justify another alternative.

"The opposing parties maintain that the business of the predecessor in interest was a commission business and that it should not be appraised because it was extinguished by his death. Although coheir Jorge Yumet, who was an employee and factor for his father during the past years and until his death, admits that he continued in the business, he excludes the rendering of accounts on the ground that the business became exclusively his own at the death of his father.

"Regarding the sugar operations, as an item of the business in general, after a study of the evidence submitted the experts concluded that that business was not the classical commission business in which the merchant need not invest funds, but that this business, by its nature, *called for investment of funds*, which funds constituted a *capital* which belonged to the estate of Ángel M. Yumet Méndez.

"The sugar business was operated as follows: Yumet Méndez was the representative for Central Coloso and South P. R. Sugar Company in this section. Whenever he made a sale, he placed an order with the Central to deliver the sugar to the customer. Yumet Méndez thereupon bound himself to pay to the Central the amount of sugar sold and assumed charge of collecting from the purchaser. *This means that Yumet Méndez always had to have available a large sum of money to operate with. In other words, he paid to the Central for the sales executed, when the money was converted into accounts receivable; he collected from the customers and again converted it into cash; again he paid to the Central and converted it into accounts receivable, and so on.*

"It is *obvious* that this being so, upon the termination of the business by reason of his death *there should have been an amount in cash and an amount in accounts receivable, which constituted personal properties in which all the heirs should have shared.*

"In order to give an idea of the magnitude of those funds, it suffices to refer to page No. 4 of the report of the experts, in which it is stated that during a period of 5 months and 11 days in the year 1949, the Coloso and South Porto Rico Sugar sales amounted to $219,880.45. This would represent an annual movement of approximately $480,000.

"Since the experts *knew for a fact* of the existence of these funds, and since *they were not shown the books where these operations of charges to customers and payment to Centrales were entered,* they were compelled to resort to some supplementary means by which this capital could be estimated. The experts selected the method which in their opinion was best suited to the circumstances of the case, in addition to being a generally accepted method within accounting practice.

"This method is the *valuing of a business by capitalizing its profits.* The profits being known, the rate of yield being known, how much capital is necessary to produce these profits at such rate? A simple arithmetical formula is sufficient to obtain the result. See Roy B. Kester, *Advanced Accounting* 366, third paragraph (4th ed.). See the letter from the experts to the judicial administrator of November 30, 1954.

"The evidence and the picture before the court also show conclusively that Yumet Méndez was a merchant who operated a commercial business, personally, with his own capital; that he also sold sugar, pork products, rice, flour, lard, canned products, and other articles of commerce; that he pledged merchandise, loaned money to merchants, charged commissions and interest. These additional items were not taken into account by the accountants in the capitalization and valuation of the business of the predecessor in interest." (Italics ours.)

We issued certiorari to review this order. As grounds for its annulment, the petitioners maintain that the value of the business of a predecessor in interest cannot be appraised independently of the properties which constitute the capital used in the business; that the inventory in this case cannot include, as real and personal properties, the speculative value of a commission business; and that the $142,810 item is the result of a conjecture. We turn to consider the first of those issues and, for the reasons which will be stated, we must conclude that the item in question should be eliminated from the inventory.

Section 568 of the Code of Civil Procedure (1933 ed.), 32 L.P.R.A. § 2401, makes it the duty of the administrator or executor to make an inventory of the real and personal properties belonging to the decedent's estate, with

the concurrence of the heirs, creditors, and other interested parties, which inventory, according to § 569, must be made in the presence of a notary public or reputable witnesses, and in the order in which the said real and personal properties are enumerated in that section. Section 570 provides that the inventory shall contain, under oath, a full and clear description of the properties comprised in the different classes, with the respective value thereof; and that in case of dispute as regards the value, the court shall appoint two appraisers to make the appraisal, and that upon completion of the inventory, the same shall be filed with the clerk of the District Court (Superior Court).[3]

■■ The evidence heard before the lower court showed that Yumet was a merchant engaged in a private sales agency as commercial agent, commercial broker, or agent.[4] It was established that he was also engaged in a personal-loan business, with or without mortgage guarantee, many of which were connected with his commercial transactions, as it appears from the testimony of witness Ramón H. Vargas and the court concluded. It was also established that he did not own any establishments, stores, or other *fixed assets*, corporeal or incorporeal, in connection with his business activities, except for the furniture of an office situated in his

---

[3] Sections 568, 569, and part of § 570 were taken from §§ 966 and 1064–67 of the Spanish Law of Civil Procedure of 1881. As to the content and function of the inventory, see Manresa's commentaries on those sections entitled *Comentarios a la Ley de Enjuiciamiento Civil*, Vols. 4 and 5 (7th ed.), as well as the judgments of the Supreme Court of Spain bearing on § 1066, which are covered by Miguel Fenech in Vol. IV of his *Doctrina Procesal Civil del Tribunal Supremo*, p. 6485. The Spanish procedure does not provide for the valuation of the properties at the time of preparing the inventory, the function of *appraising the estate* being a function of the commissioners in partition and division, assisted by experts, at a subsequent stage of the proceeding. Sections 1071, 1074, and 1077. It therefore appears that the main function of the inventory is to set forth a full and clear description of the properties, rights, and actions of the deceased belonging to the estate and of which the administrator takes charge and possession, and not *to appraise* the hereditary estate. Or, as stated by Manresa, citing from *Partida* 6: "By *inventarium* in Latin is meant, in common speech, a writing containing a description of the estate of a person deceased." The function of the

own residence valued at $450. There is no evidence of contracts of sales or commission agencies, exclusive or not, which continued beyond the life of the predecessor in interest. Notwithstanding the nonexistence of such properties or rights and actions, the administrator included the "business" in the inventory, we do not know for what account, nor on what basis he appraised it at $45,000.

Based on the criterion expressed by the said accounting firm in preparing the inventory of the hereditary estate in the sense that on the date of the death *"there should be"* several assets which constituted the *capital* of the business, without stating what those assets consisted of nor the facts supporting such belief (letter of November 30, 2d paragraph), the respondent court concluded, as a matter of fact, that at the death of the predecessor in interest *"there should have been an amount in cash* and an *amount in accounts receivable,* which constituted the personal properties to be shared in by all the heirs." (Italics ours.) Having reached this conclusion and admitting, erroneously and without evidence therefor,[5] that the predecessor in interest kept the accounting books specifically mentioned and an integral accounting system, and that this system was dismembered

_____

*appraisal of the hereditary estate* in this jurisdiction is also entrusted to the commissioner, as provided by §§ 601, 602, and 603 of the Code of Civil Procedure, 32 L.P.R.A. §§ 2622, 2623, and 2624, who is empowered to examine witnesses and experts. Unlike § 570, which does not provide any procedure for discussing the inventory, *cf. Ex parte Solla,* 15 P.R.R. 759, § 603 provides for a preliminary hearing before the court to consider and pass upon the challenges to the accountant's report on the *valuation* and division.

[4] Sections 62–66, 73–77, 162–98 of the Code of Commerce (1932 ed.), 10 L.P.R.A. §§ 1181–85, 1221–25, 1521–57. The agent may discharge the commission acting *in his own name* or in that of the principal—§ 163. The evidence was not very specific on the particular type of agency or commission business in which the predecessor in interest was engaged —see 4 Castán, *Derecho Civil Español Común y Foral* 530 (8th ed.) ; Rovira Mola, *Comisión Mercantil,* IV *Nueva Enciclopedia Jurídica* 444— but it left no doubt as to the fact that the predecessor in interest did not operate any establishment as wholesaler or retailer.

[5] Footnote 1 *ante,* p. 663.

by the opposing heirs after his death, submitting to the administrator only one loan book but not the other books "which should have shown all the properties," those segregated and *those withheld*, none of which is supported by the record, the lower court held that that "amount in cash" and "in accounts receivable" represented the capital of the business which amounted to $142,810, following the method of capitalization of profits suggested by the accounting firm, which was incorrect and wholly inapplicable to the particular situation, as we shall presently see.

Those findings cannot be upheld. In the first place, the actual existence of funds in cash and accounts was not established beyond the mere conjecture of the accountants which did not constitute evidence and which was adopted as a fact by the lower court.[6] It is true that the sugar transactions of the deceased, at least his transactions with Coloso, of which there is evidence in the record, required a certain amount of capital since the Central billed him for the sugar delivered to the different persons and entities. But this was a circulating *working capital* and not a *fixed investment* capital, which, as characterized by the respondent court, was repeatedly invested, recovered, and reinvested. That is why, even though Yumet had made sales of sugar during the 1949 grinding season for the amount of $219,880.45, as reported by the accountants, and assuming that the transactions with Guánica were made under the same terms as

---

[6] Overlooking the power to entrust to the accountants the preparation of the inventory, a function which is by law imposed on the judicial administrator who acts under oath and bond, with the intervention of the interested parties and in pursuance of the requirements provided by §§ 568, 569, and 570 of the Code of Civil Procedure, and since they did not act as a master with the power to hear evidence and submit conclusions thereon, the extrajudicial statements of the accountants on the alleged existence of hereditary properties which were not included in the estate, have no probative force unless they be supported by competent evidence heard before the court. The only appearance in court of the accountants was to signify their impossibility to prepare an inventory because of lack of accounting books which were not in their possession.

Coloso, it does not lead to the inescapable conclusion that at his death there should have been funds in cash or accounts receivable in excess of the inventoried amount of $40,629.09.[7]

The orders for sugar specified the names of the entities to which it was delivered. Knowing, as they did, the total amount of sugar purchased, at least during the grinding season preceding the death, it would have been easy for the administrator and the accountants, had they inquired into the matter, to determine with reasonable accuracy, and not through speculative procedure, what part of that sugar had been sold and collected and what part was still pending collection or in stock at the death of the predecessor in interest. They could have also determined with the same reasonable certainty whether all the money received by the predecessor in interest from those operations was deposited or not. In any event, had the court been convinced of any existence of properties, funds, or accounts which were concealed and not included in the estate, the proper thing to do at law was to order the administrator to institute such proceedings, within or collateral to the judicial administration, against heir Jorge Yumet, who was the person in charge of the transactions during the past years in his capacity as attorney in fact for the predecessor in interest and of the estate during the period preceding the administration, or against the proper parties, to require a rendition of accounts of the funds and other assets belonging to the estate, so that this question of fact, with the strong implication of fraud or concealment of properties which appears from the order appealed from, could have been decided upon competent evidence. *Berman* v. *Leckner*, 52 A.2d 464;

---

[7] The orders and bills of Coloso—Guánica's are not known—show that during the 1949 grinding season the predecessor in interest purchased sugar for the amount of $10,500 in February, $12,000 in March, and $5,700 in April. The largest order amounted to $1,500, and the remainder ranged from $1,200 to $300. The greatest purchase on one day, February 12, amounted to $6,300. (Tr. Evid. 199–213.) This is an index of the movement of the capital.

*Eisentraut* v. *Cornelius,* 115 N.W. 142; *Young* v. *Dean,* 48 So.2d 779; *In re Ulrich's Estate,* 155 N.Y.S.2d 926; *In re Clemente's Estate,* 138 N.Y.S.2d 254; *Keshner* v. *Keshner,* 33 N.E.2d 877; *Starkweather* v. *Williams,* 41 Atl. 1003; *Floyd* v. *Victory Sav. Bank,* 189 S.E. 462; *In re Halaska's Estate,* 30 N.E.2d 119; *cf.* § 584, *Cod. Civ. Proc.* 1933, 32 L.P.R.A. § 2471; *Montalvo* v. *Ferrero,* 56 P.R.R. 829; *Trinidad et al* v. *Suc. of Trinidad et al.,* 19 P.R.R. 616.

In the second place, even if the existence of a *capital* consisting of funds and accounts receivable had been established as a fact, the method used in determining the amount thereof was erroneous. The capitalization of income has been accepted as a general principle, taking into account all other pertinent factors, as a supplementary means of fixing the market value of real property (above or below the *cost invested*) in the absence of other more direct indices of such value, such as agency sales and other voluntary transactions, or costs of reproduction less depreciation; or as a method of fixing the market value of corporate shares apart from the book value, usually in family corporations the shares of which are not in the open market; or in determining the interest of a partner in a partnership; or in fixing the intangible value or good will of a going concern or business, in addition to the value of its plant and other properties; in setting out some illustrative examples. A. D. Jahr, *Eminent Domain, Valuation and Procedure —Income as Evidence of Value of Real Estate,* Ch. XXII, p. 225 *et seq.;* Bronbright, *Valuation of Property—Capitalized Income as a Measure of Value,* Vol. I, Ch. II, p. 216 *et seq.;* Schnutz, *Condemnation Appraisal Handbook—Reproduction and Capitalized Values* 11; McMichael's *Appraising Manual—Capitalizing Income into Value* (3d ed.), Ch. 11, p. 90; Orgel, *Valuation under Eminent Domain— Income as Evidence of the Value of Real Estate—Business Profits,* Vol. 1, Ch. XIV, p. 646; R. H. Forster, *Valuing a Business Interest for the Purposes of a Purchase and Sale*

*Agreement,* 4 Stan. L. Rev. 325; A. A. Kragen, *Some Thoughts on the Valuation of Closely Held Business Interests,* 43 Cal. L. Rev. 781; A. E. Grunewald, *An Old Formula in New Attire,* 11 Tax. L. Rev. 190; Annotations in 104 A.L.R. 790, 95 A.L.R. 442; *cf. Heirs of González v. Sucrs. of Roque González & Co.,* 33 P.R.R. 540, 551. But we know of no authority—neither does Professor Kester—cited by the lower court in support of its conclusion, which accepts, as a rational and logical method for establishing at a given moment the existence and amount of funds and other *non-fixed* assets of a business, the capitalization of its profits.[8]

In this case the method used leads to the conclusion, fundamentally illogical in itself by the absence of causal relation, that, because the predecessor in interest obtained from his sugar transactions average profits during three years totalling $7,140.50 (in which the sum of $4,139.78, corresponding to a period subsequent to his death, was unduly included), at the time of his death there should have been funds in cash and accounts receivable amounting to $142,810. The question being reduced to its bare reality,

---

[8] Kester, *Advanced Accounting* (4th ed). In the example which appears in the third paragraph at p. 366, cited by the court, Kester sets out one of the various methods employed for determining the intangible value or good will of a going business, and states that under that method the average net profits are capitalized at some agreed rate, giving the amount of money on which the average profits could be earned at the rate used. The *difference* between this amount and the amount of *capital actually invested* gives the amount of the intangible value or good will of the business. Kester illustrates the previous method with the following example: if on an *investment* of $250,000 the net average profits are $60,000 and the normal rate for this business is 15 per cent, $60,000 would represent a 15 per cent income on $400,000. Good will must therefore represent the difference between $400,000 and $250,000, or $150,000. Otherwise stated, a going business operated on an investment of $250,000, the normal profits from which should be 15 per cent for the particular activity of the business, should produce average profits of $37,500. Profits obtained in excess of $22,500, would represent an additional capital of the business equivalent to $150,000, consisting of the intangible assets which make up its good will.

the court held that there were funds and credits worth $142,810, which the heirs withheld, concealed, or in some way did not place at the disposal of the administrator.

■■ In view of the foregoing, we need not discuss the other two questions raised by the petitioners. It suffices to say, in case that was the purpose in including the sales agency of the predecessor in interest as an item of the inventory, that although the good will of a going business is an element to which a value can be given by itself, and as such may form part of the inherited property together with an enterprise which passes to the estate, such value can never be considered separately from and independently of the enterprise itself and its properties. *Lavene* v. *City of Salem*, 229 P.2d 255; *Maola Ice Cream Co.* v. *Maola Milk & Ice Cream Co.*, 77 S.E.2d 910; *Lerner* v. *Stone*, 252 P.2d 533; *Smith* v. *Davidson*, 31 S.E.2d 477; *McIlvaine* v. *City Nat. Bank and Trust Co. of Chicago*, 42 N.E.2d 93; *Grace Bros.* v. *Commissioner of Internal Revenue*, 173 F.2d 170; *Clark* v. *Lucas County Board of Review*, 44 N.W.2d 748. The business activities of the predecessor in interest constituted a personal relation or agency which terminated with his death. There did not exist, therefore, any intangible assets, in addition to the corporeal properties used in those commercial activities, to be inventoried as inherited property. *In re Leserman's Estate*, 260 N.Y.Supp. 188; *In re Martin's Estate*, 33 N.Y.S.2d 81; *Coffey* v. *Metro-Goldwyn-Mayer Corp.*, 289 N.Y.Supp. 882; *In re Bluestein's Estate*, 95 N.Y.S.2d 874; *Magee* v. *Pope*, 112 S.W.2d 891; *cf.* § 198 Code of Commerce 1932, 10 L.P.R.A. § 1557; § 1623 Code of Civil Procedure 1930, 31 L.P.R.A. § 4481.

For the reasons stated, the order appealed from will be set aside and the $142,810 item eliminated from the inventory. The original record will be remanded to the Aguadilla Part of the Superior Court for further proceedings consistent with this opinion.