RÁUL, JORGE, ESTHER, GLADYS, ÁNGEL MARÍA y NATHANIEL YUMET CHACÓN, peticionarios, *v.* TRIBUNAL SUPERIOR DE PUERTO RICO, SALA DE AGUADILLA, HON. WILLIS RAMOS VÁZQUEZ, JUEZ, demandado, y ANGELINA YUMET PIZÁ, interventora.

Número 2182.

*Reasignado:* 11 de diciembre de 1957. *Resuelto:* 8 de septiembre de 1958.

*Enrique Báez García,* abogado de los peticionarios; *García Méndez & García Hermida* y *Benjamín Ortiz,* abogados de la interventora.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del Tribunal.

Ángel M. Yumet falleció en Aguadilla el 11 de junio de 1949, sin otorgar testamento. Le sucedieron seis hijos legitimados hermanos de doble vínculo, su viuda, y una hija na-

tural reconocida, la interventora Angelina Yumet. La viuda falleció poco tiempo después dejando como únicos herederos a sus hijos habidos con el causante, y por acuerdo o consentimiento de la sucesión, el heredero Jorge Yumet quedó como administrador o encargado de la herencia. Aproximadamente dos años y medio más tarde, la interventora acudió a la Sala de Aguadilla del Tribunal Superior en solicitud de una administración judicial que fué decretada, nombrándose administrador al Lcdo. Luis A. Rosario.

Con la intervención de los interesados, el administrador preparó el inventario de los bienes de la herencia que dispone el art. 568 del Código de Enjuiciamiento Civil, (ed. 1933) y en 4 de diciembre de 1952 lo radicó en el tribunal. Dicho inventario comprendía bienes muebles e inmuebles por valor de $355,408.34 entre los cuales se incluyó dinero efectivo y depósitos en bancos por $40,629.09; muebles de oficina valorados en $450 y una partida descrita así por el administrador: "Negocio de comisiones, de representaciones sobre azúcar, arroz, productos de cerdo y otros productos objeto de comercio"—$45,000. Los herederos opositores en la administración judicial, aquí peticionarios, aceptaron el referido inventario y valor del caudal excepto la partida de $45,000 referente al negocio de comisiones y de representaciones, la cual impugnaron en todo momento como inexistente.

En 12 de febrero de 1953 se celebró una vista ante el Tribunal Superior con intervención de las partes. En el curso de la misma el juez anunció que se oiría prueba "para determinar si el causante Ángel M. Yumet Méndez era un comerciante, o era un 'broker' ". Sostenían los herederos que el negocio constituía una relación o representación personal del causante que se extinguió con su muerte, y la interventora alegaba la existencia de un negocio que había pasado a la sucesión. A los efectos anunciados, ella ofreció la siguiente prueba:

Arturo Hernández, cajero de Central Coloso, declaró que conoció al causante como *broker* y comerciante, y con vista

de los récords de la central, manifestó que Yumet mandaba órdenes para despachar azúcar que vendía en el comercio; que después de muerto los negocios se hicieron a nombre de Ángel M. Yumet, Sucesores, firmando Jorge Yumet; que no le conocía establecimiento comercial alguno al causante a la fecha de su muerte; que Yumet había tenido un almacén hacía más de 20 años y después no le conoció ningún otro, y realizaba las operaciones en su casa; que los azúcares que compraba el causante se quedaban en la central y él ordenaba su despacho para distintas personas; que la central expedía cheques a Yumet por concepto de comisiones a base del total de ventas durante el mes—una bonificación de 1½% de comisión; y que la central facturaba directamente a Yumet, quien pagaba el azúcar. El testigo identificó, y se admitieron en evidencia, órdenes y facturas acreditativas de las transacciones del causante con Central Coloso. Todas estas órdenes eran al efecto de que la central despachara directamente a determinadas personas o firmas comerciales cantidades de sacos de azúcar. Las facturas por el importe del azúcar así despachado se hacían a nombre del causante.

La declaración del testigo Ramón H. Vargas, quien dijo haber realizado en una época negocios con Yumet, tendió a demostrar que éste hacía operaciones propias de un comerciante mayorista y detallista que compraba, almacenaba y vendía, y propias también de un representante o agente mediador de comercio que tomaba órdenes de productos, arroz principalmente, y las enviaba para su despacho, ganándose lo que el testigo llamó un sobreprecio. Manifestó que el causante era una de las personas que más sabían de arroz, y en ocasiones borraba el precio básico del producto fijado por el productor e informaba uno mayor, beneficiándose así con un sobreprecio hecho al cliente en adición a la comisión que recibía del molino, y expresó también que Yumet prestaba al comerciante dinero para hacer las órdenes o pedidos cobrándole además, los intereses. Surge de su declaración, sin embargo, que las operaciones del causante típicas de un comerciante

mayorista o detallista se realizaron en una época bastante remota a su muerte.

El Gerente del Banco Popular de Aguadilla, Gilberto Veray, declaró que conoció a Yumet como comerciante y en negocio de préstamos y de comisiones; que el banco tramitaba el cobro de giros del causante a cargo de otros, y giros de él personalmente; que pagaba y le pagaban en cheques, compraba y vendía, y vendía a nombre de otras personas, y que no poseía establecimiento. Tenía una oficina y realizaba los negocios de arroz y de azúcar por correo y a través del banco.

La interventora llamó a declarar al administrador, Lcdo. Luis A. Rosario. Manifestó que conocía a Yumet como comerciante y comisionista; que había comprobado que el causante hacía órdenes de azúcar para la central Coloso las cuales pagaba con dinero propio, y la central despachaba el azúcar a las personas mencionadas en la orden facturando directamente al causante, a quien se le concedía algún por ciento sobre el total de las ventas, en concepto de comisión. El administrador expresó que no tuvo ante si libro alguno, o constancia otra alguna de la contabilidad de los negocios del causante, excepto un libro de préstamos, cheques cancelados, giros y talonarios de los cheques expedidos por éste. A petición suya y de la interventora, y con la oposición de los demás herederos, el tribunal dispuso en el curso de esa vista el nombramiento de una firma de contadores para que rindiera un informe contabilizado de todos los bienes dejados por el causante. (T. E. págs. 311, 313, 319.) A tal fin dictó orden por escrito fechada 18 de febrero de 1953 designando a la firma Pol, Toro, Gil y Compañía para que rindiera un informe al tribunal por conducto del administrador judicial "de todo el haber y débito dejado a su fallecimiento por el causante Ángel María Yumet Méndez."

En una segunda vista celebrada el 12 de junio de 1953, comparecieron los contadores Emiliano Pol y César E. Rodríguez y aseveraron al tribunal una y otra vez que por falta de libros de contabilidad que no se habían suministrado, y de

otra información necesaria, ellos no podrían rendir un informe completo y cabal que valiera la pena y que sirviera de alguna utilidad o beneficio a la justicia y para la disposición del caso, y que con la evidencia en su poder no estaban en condiciones de decir si se trataba de un negocio de "comisiones" o de un negocio "comercial". A preguntas más bien hipotéticas de carácter pericial, Pol declaró que en un negocio de la naturaleza del negocio del causante *se justificaba* el llevar libros de contabilidad y récords subsidiarios, tales como un mayor general, jornal general, libro de caja o cobranzas, registro de desembolsos, registro de cheques y otras cuentas parecidas. El contador César E. Rodríguez reafirmó que no tenían libros de contabilidad que pudieran dar detalles de los negocios del causante hasta su muerte, excepto un libro de préstamos antes del fallecimiento y otro auxiliar después que cubría hasta 1952; que ellos no podían determinar los negocios que tenía Yumet, y que sin otra prueba no podrían rendir un informe que diera luz al tribunal. Aceptó que tenía en su poder los talonarios y cheques cancelados del causante de 1948 y 1949 correctamente reconciliados con el banco, y también cheques de 1947 que aún no había examinado. De los autos surge que antes de esta vista los contadores habían recibido las facturas originales de Central Coloso y de Central Guánica cubriendo los años 1948 y 1949; así como los estados de comisiones de otras firmas durante el mismo período. Según sus testimonios ellos no habían investigado en esas fuentes, ni en los bancos, ni con las personas y entidades a quienes el causante vendía, no obstante ser información que necesitaban expresando que ello era una labor minuciosa, tediosa y larga que tomaría tiempo. No hay constancia de que tal investigación la realizaran posteriormente.

Jorge Yumet declaró en esa vista, y manifestó que él había entregado todos los libros y documentos que existían en su poder al administrador y a los contadores; que el causante no llevaba la contabilidad descrita por éstos; que su padre preparaba personalmente sus declaraciones de ingreso y lle-

vaba sus cuentas, no tenía tenedor de libros ni empleados y el único libro que existía era el de préstamos porque necesitaba dejar constancias en él durante varios años, mientras que en el negocio de comisiones la factura misma reflejaba quién recibía el dinero así como la cantidad; que el causante mantenía su oficina en su propia residencia y no tenía comercio, ni llevó nunca un sistema de contabilidad. Los herederos solicitaron que se relevara a los contadores de preparar el inventario que se les había encomendado hacer, en vista de que éstos se manifestaron imposibilitados de realizarlo por ausencia de datos, a lo cual el juez se negó de plano. (T. E. pág. 382.)

En 24 de junio de 1953 el tribunal dictó resolución en que haciendo referencia a la vista del 12 de junio, se expresó así:

"Después de considerar dichas mociones por sus méritos y en relación con la evidencia presentada, *es obvio concluir* que don Ángel M. Yumet Méndez *llevaba en sus negocios un set completo de libros de contabilidad,* que los contables estiman que comprende un Mayor General, Jornal General, Libro de Recibos de Caja y Cobranzas, y un Registro de Desembolsos que en unión de otros papeles, datos y documentos por ellos requeridos y que aparecen de la moción del Administrador Judicial de fecha 28 de mayo de 1953 y que *todos los interesados conocen,* se hacen absolutamente necesarios producir para ellos poder cumplimentar rápidamente la encomienda que se les hizo . . . . . Considerando todas las circunstancias de este caso, el Tribunal resuelve conceder y concede a los opositores un término de diez días para que éstos busquen y entreguen a los contables señores Pol, Toro, Gil y Compañía, los libros y documentos solicitados, y éstos tendrán treinta días a partir de dicha entrega para rendir su informe final al tribunal.

"En el caso de que los opositores *no entreguen* dicha documentación en el término prefijado, se ordena que dicha firma de contables Pol, Toro, Gil y Compañía proceda, por *todos los medios supletorios* que estén a su alcance, a obtener toda la información que necesiten, a fin de que rindan lo antes posible

al Tribunal el informe que se les ha encomendado." (¹) (Énfasis nuestro.)

En 8 de marzo de 1954, cerca de 9 meses después, se ordenó a los contadores que rindieran su informe dentro de un término de 30 días, con apercibimiento que de no hacerlo en ese plazo "el tribunal procederá a formular el inventario sin el beneficio de dicho informe y, por lo tanto, no autorizará el pago de honorarios de clase alguna a dicha firma de contables." En junio 1ro. el administrador sometió el informe de los contadores. El mismo no aparece en el expediente, pero por referencias a él sabemos que contenía la partida de $45,000 incluída en el inventario originalmente archivado. (²)

El tribunal ordenó la radicación de un inventario final con miras al informe de los contadores que fué sometido el 14 de diciembre de 1954. La partida de $45,000 aparecía ahora aumentada a $142,810 y para explicar el cambio, el administrador acompañó una carta de los contadores fechada 30 de

---

(¹) Por el efecto que tuvieron en la decisión del caso, procede hacer constar que las conclusiones de hecho a que llegó el tribunal recurrido en la anterior resolución, carecen de base en los autos. Ni de la prueba oral desfilada en las vistas de 12 de febrero y 12 de junio de 1953, ni de las demás constancias escritas, surge que el causante llevara libros de contabilidad ni específicamente los mencionados, excepto un libro de préstamos. La evidencia afirmativamente demuestra lo contrario. La declaración de los contadores, de índole pericial en este aspecto, fué en el sentido de que un negocio como el del causante justificaba que se llevara un sistema de contabilidad y los libros descritos por ellos, pero no declararon, ni aparentemente tenían conocimiento para hacerlo, que tales libros se llevaban y que como cuestión de realidad existían.

(²) En el alegato de los peticionarios se transcribe la siguiente parte del informe:

"NEGOCIO DE COMISIONES Y REPRESENTACIONES

"De los libros y otros récords disponibles no se ha podido determinar el valor del negocio a la fecha de la muerte del Sr. Yumet, en 11 de junio de 1949.

"De estimarlo conveniente ese Honorable Tribunal, podría hacerse una capitalización tomando como base el promedio de ingreso neto del negocio durante los últimos tres años, a razón de una utilidad neta de un 5%.

"Mientras tanto, hemos tomado para los efectos de nuestro informe la valoración de $45,000 dada por el Administrador Judicial en su inventario del 3 de diciembre de 1952, sometido a ese Honorable Tribunal."

noviembre de 1954, posterior al informe rendido por ellos, que en lo pertinente lee así:

"En relación con su carta del quince de noviembre, la cual fué recibida en esta oficina en el día de ayer, tenemos el gusto de informarle lo siguiente:

"Aunque en ningún momento *se nos han mostrado los libros del negocio* de don Ángel M. Yumet Méndez, con excepción del subsidiario de préstamos, de la investigación realizada hemos concluído que, por la forma en que este negocio operaba, a la fecha del fallecimiento *debía haber* varios activos que constituían *el capital* del mismo.

"Ante la imposibilidad de ofrecer cifras exactas nos limitamos en nuestro informe a recomendar un método de estimar este *capital,* que es de aceptación general. Es obvio que en ausencia de datos ciertos, un estimado hecho por métodos aceptados es la única alternativa razonable. Por este motivo creemos que usted debe usar dicho método para llegar a una valoración razonable *del capital que se necesitaba* para operar el negocio de don Ángel M. Yumet Méndez.

"En el curso ordinario de los negocios ocurre con frecuencia que un negocio vale más que lo que reflejan sus récords. Llegando el momento de venderlo surge el problema de su valoración. Para llenar esta necesidad se ha desarrollado el método de la capitalización de los beneficios. Este método provee que se tome el beneficio promedio de los últimos años y se determine qué capital es necesario para producir dicho beneficio al por ciento normal de rendimiento en esa clase de negocio.

"En este caso, tomando como base el beneficio de azúcar consignado en las declaraciones de ingresos obtendríamos las siguientes cifras:

"Año
| | | | | |
|---|---|---|---|---|
| "1947 | | | | $7,890.20 |
| "1948 | | | | 6,087.77 |
| "1949 | $3,303.75 ÷ 162 días a $20.393 | $3,303.75 | | |
| | 203 días a $20.393 | 4,139.78 | | 7,443.53 |

 "Total de tres años $21,421.50
 "Promedio por año $7,140.50

"Tomando como base un rendimiento de un cinco por ciento, entonces sería necesario un capital de $142,810 para producir un beneficio promedio ascendente a $7,140.50.

"Al tomarse esta valoración, el estado de activo y pasivo presentado en nuestro informe deberá variar en la siguiente forma:

"Donde lee Valor del Negocio, la cantidad de $45,000.00 deberá sustituirse por $142,810.00. El total del activo ascenderá entonces a la cifra de $491,859.15. El capital relicto montará a $478,466.02."

Con la oposición de los herederos a la partida de $142,810 se aprobó el inventario final incluyendo la misma. En vista de que la controversia desemboca fundamentalmente en una cuestión *de hecho* es preciso que expongamos las conclusiones del tribunal recurrido en que basó su determinación final:

"La preparación de un proyecto de inventario final ha sido tarea harto difícil en esta Administración que ha sido objeto de grandes controversias desde su origen. Para tener una idea del conflicto de intereses aquí existente, bastaría mencionar que están en pugna cuantiosos bienes; y que hay seis hermanos unidos como opositores contra el interés de una hermana, como peticionaria, quien ha alegado grandes irregularidades; bienes omitidos consistentes en cuantiosas sumas en efectivo, bienes raíces, derechos y acciones, préstamos y créditos hipotecarios, bienes traspasados a nombre de otras personas, pero que en realidad pertenecían al causante. Y se alegó además que la mayoría de dichos bienes eran de origen privativo del causante, pero que se figuraban como gananciales en perjuicio de dicha peticionaria, que valga decir era hija natural reconocida, mientras que sus seis hermanos eran naturales habidos en otra madre y legitimados por el subsiguiente matrimonio de sus padres.

" . . . . . . . .

"*Los contables no pudieron conseguir de los opositores se les entregara la contabilidad e información que era necesario para cumplir su cometido.* El administrador judicial acudió a este Tribunal en solicitud de los remedios correspondientes y por orden de 28 de mayo de 1953 se señaló el 12 de junio de 1953 para la vista de varias mociones, se oyó a las partes y a los contables y finalmente el Tribunal dictó su resolución de 24 de junio de 1953, de la que extractamos, para no extender demasiado esta resolución [resolución comentada por nosotros en el escolio 1, ante pág. 687]:

"Como resulta del expediente de este caso, los únicos libros sometidos por el co-heredero Jorge Yumet a los contables fueron los siguientes:

"1.—Un mayor subsidiario de préstamos a cobrar que registra préstamos hechos por don Ángel M. Yumet Méndez por el período comprendido entre el 30 de agosto de 1928 y el 11 de junio de 1949.

"2.—Un mayor general de las operaciones de la Sucesión de don Ángel M. Yumet Méndez a partir del 11 de junio de 1949.

"3.—Un jornal general de la Sucesión de don Ángel M. Yumet Méndez donde se registraron las operaciones a partir del 11 de junio de 1949.

"Como puede verse, el primero es el único de los libros que se refiere a operaciones hechas en vida del causante Yumet Méndez. Los otros dos se comenzaron por el co-heredero Jorge Yumet después de la muerte del causante y se relacionan con su Sucesión. Toda vez que lo que se interesa es relacionar los bienes y deudas del señor Yumet Méndez a su fallecimiento, es obviamente claro que los libros que puedan arrojar más luz son los de sus operaciones hasta ese momento. Los de su Sucesión no habrían de incluir algún *activo, datos e información que conviniese ocultarse,* y por lo tanto, no son tan importantes.

"Sabemos que en todo sistema de contabilidad deberá haber por lo menos dos libros o registros principales, a saber: un jornal general y un mayor general. El jornal general sirve para ir asentando las operaciones del negocio en orden cronológico, de suerte que este registro resulte ser una historia ordenada de la vida del negocio. Ahora bien, esta relación cronológica de las operaciones carecería de valor a los efectos de interpretar la situación financiera del negocio y de determinar el resultado de las operaciones.

"Para que sea posible hacer la interpretación de la situación financiera a que nos hemos referido, sería necesario clasificar la información por conceptos e irla agrupando en lo que los contables llaman 'cuentas'. Aquí es donde entra en juego el mayor general, porque este récord se compone de las 'cuentas', a saber: cuentas de caja, cuentas a cobrar, inventarios, mobiliarios, casas y solares, hipotecas a cobrar, cuentas a pagar, compras, ventas, gastos generales y otros conceptos que incluídos en la denominación de 'cuentas', forman el mayor general. Es generalmente conocido que para cada uno de estos conceptos se

abre una hoja en el mayor general. Luego, del libro jornal donde se asientan las transacciones en el orden en que ocurren, se transfieren las operaciones al libro mayor agrupando la información en la cuenta a que corresponda. En el libro mayor se anota el folio del libro jornal en donde se hizo el asiento original y en el libro jornal se anota la hoja del mayor a la cual se transfiere cada transacción. Estos números se anotan en una columna llamada folio y sirven para facilitar la búsqueda de información.

"Según aparece de los autos *no se entregaron a los contables los libros jornales, ni los mayores generales, ni los recibos de caja y cobranzas, ni los registros de desembolsos,* ni los demás datos y documentos a que se refiere nuestra resolución de junio 24 de 1953. A los efectos de determinar el activo y pasivo del causante a su muerte, sólo se entregó un mayor subsidiario de préstamos a cobrar, pero puede fácilmente verse que lo que se entregó fué sólo un miembro o parte de un sistema de contabilidad. *Lo que aparentemente resulta que se ha hecho en este caso, es desmembrar un sistema de contabilidad y someter solamente un miembro o parte del mismo, alegándose* que ese es todo el sistema. Es como si en un caso penal en el que no apareciendo el cadáver del occiso, después de una gran búsqueda alguien le entregase al fiscal un brazo de un ser humano y le dijese 'señor fiscal, aquí tiene usted el cadáver que busca'. 'Y el resto del cadáver, dónde está?' preguntaría el fiscal. A lo cual le responderían: 'no hay resto, ni lo hubo nunca, este ser humano es y era siempre este brazo.'

". . . . . . . .

"*Por qué no aparecen estos libros del causante?* De esto sólo se puede hablar a base de conjeturas, pero al reflexionar sobre el asunto veremos que el *jornal, siendo libro de entrada original,* contenía *en forma cronológica todas las transacciones realizadas;* que este récord constituye una historia minuciosa y detallada del negocio *y que si el mismo hubiese sido sometido a los peritos,* a ellos les hubiese sido muy fácil reconstruir todo el debe y el haber de don Ángel M. Yumet Méndez a la fecha de su muerte.

"Además, y presumiendo que este libro fuere el único que existiese, puede observarse que faltan en él todas las cuentas de ingresos y gastos que recopilaron las cifras que fueron incluídas en las declaraciones de contribución sobre ingresos. Esto es así, debido a que los ingresos y gastos se anotan en el mayor general y no en un subsidiario de cuentas a cobrar, único libro sometido

para este período, *queda pues confirmado que el libro presentado no es sino un miembro de un sistema mayor cuyas otras partes no han sido presentadas.*

"Qué pueden haber contenido esos libros jornal y mayor que no fueron sometidos? En estos libros se asentaban todas las entradas del negocio, el cual fué también desmembrado de los bienes de la Sucesión a partir del fallecimiento del causante Sr. Yumet Méndez. *También se asentaba el movimiento de caja* de la cual sólo se sabe por el inventario de bienes realizado por Jorge Yumet para entregarlo al Negociado de Contribución sobre Herencia, meses después del fallecimiento del Sr. Yumet Méndez.

"Es significativo observar que los únicos bienes transferidos a la Sucesión son los préstamos contenidos en este libro más los bienes raíces, *motivo adicional para no presentar los otros en los cuales se hubiese visto el total de los bienes,* los segregados *y los retenidos,* si alguno. *Y si no hubiese habido retención,* no hubiese sido más claro y limpio presentar el mayor general con todos los bienes y mostrar que éstos eran los mismos que luego fueron transferidos a la Sucesión?

"Los contables han rendido sus informes finales a pesar de no habérseles entregado la casi totalidad de la información ordenada por el Tribunal, *ni los libros de contabilidad que llevaba el causante,* no sólo a juicio de la peticionaria, sino que así resulta meridianamente de los pocos récords y libros convencionales que fueron suministrados por el co-heredero Jorge Yumet a los contables. (Véase a estos efectos las páginas 2–7 del informe original de los peritos Pol, Toro, Gil y Cía.)

"La ausencia de estos libros obligó a los peritos necesariamente a recurrir al elemental procedimiento de realizar un inventario de estos bienes y comprobar su veracidad hasta donde fuere posible.

"La evidencia sometida, fundamentalmente toda de carácter afirmativo, sostiene la existencia de un negocio del causante, del cual la Sucesión era responsable tanto en derecho como en obligaciones, negocio que constituía obviamente la principal fuente de ingresos de dicho causante y de cuyo negocio se apoderó el co-heredero Jorge Yumet, después de la muerte de su padre y para su propio beneficio. El Administrador y los peritos contables recomiendan la aprobación de la partida de $142,810, en que valoraron dicho negocio, que consideran justa y razonable. El método usado por los peritos convence al tribunal de

que no procede la eliminación de la partida así consignada. No hay nada que justifique en los autos otra alternativa.

"Los opositores sostienen que el negocio del causante era uno de comisiones y que no procede su tasación porque se extinguió con su muerte. El co-heredero Jorge Yumet, quien era un empleado, factor, de su padre durante los últimos años y hasta la muerte de éste, aunque admite que continuó el negocio, excluye la rendición de cuentas, alegando que dicho negocio pasó a ser exclusivamente suyo una vez muerto su padre.

"En lo que al negocio de azúcar se refiere, como un renglón del negocio en general, los peritos, después de estudiar la evidencia sometida, concluyeron que dicho negocio no era el negocio clásico de comisiones en el cual no es necesario que el comerciante invierta fondos, sino que este negocio, por su naturaleza, *requería inversión de fondos,* cuyos fondos constituían un *capital* que pertenecía a la Sucesión de don Ángel M. Yumet Méndez.

"El negocio de azúcar funcionaba de la siguiente manera: El Sr. Yumet Méndez era el representante de la Central Coloso y de la South P. R. Sugar Company en este sector. Cuando él efectuaba una venta de azúcar expedía una orden a la Central para que dicha azúcar le fuese entregada al cliente. Inmediatamente el Sr. Yumet Méndez venía obligado a pagar a la Central el importe del azúcar vendido y se hacía cargo de cobrar la cuenta al comprador. Esto *quiere decir que el Sr. Yumet Méndez tenía que tener siempre disponible una fuerte suma de dinero la cual usaba en forma circulante. Esto es, pagaba a la Central por ventas hechas, en este momento el dinero se convertía en cuentas a cobrar de clientes, cobraba a los clientes y volvía a convertirlo en efectivo, volvía a pagar a la Central y a convertirlo en cuentas a cobrar y así sucesivamente.*

"Es *obvio* que siendo esto así, al detenerse su negocio con motivo de su fallecimiento, *tenía que haber una cantidad en caja y una cantidad en cuentas a cobrar, las cuales constituían bienes muebles en los que debieron participar todos los herederos.*

"Para dar una idea de la magnitud de esos fondos basta con referirse a la página número cuatro del informe de los peritos en la cual se expresa que durante el período de cinco meses once días del año 1949 las ventas de azúcar de Coloso y South Porto Rico ascendieron a $219,880.45. Esto representaría un movimiento anual de aproximadamente $480,000.00.

"Como los peritos *tenían la certeza* de la existencia de estos fondos y como *no se les mostró los libros donde se registraban*

*estas operaciones de cargos a los clientes y pagos a las Centrales,* tuvieron entonces que valerse de algún medio supletorio mediante el cual se pudiera estimar este capital. Escogieron los peritos el método que a su juicio se adaptaba mejor a las circunstancias del caso, siendo además un método de aceptación general dentro de la práctica de contabilidad.

"Este método es el de *valorar un negocio mediante la capitalización de sus beneficios.* Conocidos los beneficios, conocido el por ciento de rendimiento, qué capital es necesario para producir estos beneficios a ese rendimiento? Una sencilla fórmula aritmética es suficiente para obtener el resultado. —Véase Roy B. Kester, *Advanced Accounting Fourth Edition,* página 366, párrafo tercero. Véase la carta de los peritos al Administrador Judicial del 30 de noviembre de 1954.

"La evidencia y el cuadro que tiene ante sí el Tribunal además es definitivamente convincente de que el Sr. Yumet Méndez era un comerciante que tenía un negocio de comercio, individualmente, con capital propio; que vendía además de azúcares, productos de cerdo, arroz, harina, manteca, productos en latas y demás artículos de comercio; que pignoraba mercadería, facilitaba dinero a comerciantes, cobraba comisiones e intereses. Estos renglones adicionales no se tomaron por los contables en la capitalización y valoración del negocio del causante." (Énfasis adicionado.)

Expedimos certiorari para revisar esta resolución. Los peticionarios aducen como fundamentos para que se anule, que el valor que tenga el negocio de un causante no puede tasarse con independencia de los bienes que constituyen el capital utilizado en el mismo; que en el inventario en este caso no puede incluirse, como bienes muebles e inmuebles, el valor especulativo de un negocio de comisiones, y que la partida de $142,810 es el resultado de una conjetura. Empezaremos por el último de dichos planteamientos y, por las razones que pasamos a exponer, hemos de concluir que procede eliminar del inventario la mencionada partida.

 El art. 568 del Código de Enjuiciamiento Civil (ed. 1933) 32 L.P.R.A. sec. 2401, impone al administrador o albacea la obligación de formar el inventario de los bienes muebles e inmuebles pertenecientes a la sucesión del finado, con la

concurrencia de herederos, acreedores y demás personas interesadas, inventario éste que, de acuerdo con el art. 569, debe formalizarse en presencia de un notario público o de testigos acreditados y siguiéndose el orden en que los referidos bienes muebles e inmuebles aparecen en dicho artículo enumerados. El art. 570 estatuye que en el inventario se hará, bajo juramento, una descripción clara y precisa de los bienes comprendidos en las distintas clases, con expresión de su valor respectivo; y que en caso de disputa respecto al valor el juez nombrará dos peritos para que hagan la valoración, y terminado el inventario, se entregará al secretario de la corte de distrito [Tribunal Superior]. (³)

■■ La prueba desfilada ante el tribunal *a quo* demostró que Yumet era un comerciante dedicado a representaciones personales como agente mediador o corredor de comercio, comisionista o mandatario mercantil. (⁴) Se probó que él se

---

(³) Los arts. 568, 569 y en parte el 570 proceden de los arts. 966 y 1,064 al 1,067 de la Ley española de Enjuiciamiento Civil de 1881. Sobre el contenido y la función del inventario, véanse los comentarios de Manresa a dichos artículos en "Comentarios a la Ley de Enjuiciamiento Civil" Vols. 4 y 5 (7a. ed.), así como las Sentencias del Tribunal Supremo de España en torno al art. 1,066 que recopila Miguel Fenech en el Vol. IV de su "Doctrina Procesal Civil del Tribunal Supremo" pág. 6485. En el procedimiento español no se dispone la valoración de los bienes al prepararse el inventario, correspondiendo la función del *avalúo del caudal* a los contadores-partidores asistidos de peritos, en una etapa posterior del procedimiento. Arts. 1,071, 1,074, 1,077. De donde se desprende que la función primordial del inventario es la de relacionar en forma fehaciente los bienes, derechos y acciones del finado pertenecientes a la sucesión, que vienen a poder y conocimiento del administrador, y no la de *evaluar* el caudal relicto. O como expresa Manresa, citando de la *Partida* 6a: "inventario en latín tanto quiere decir en romance como escritura que es fecha de los bienes del finado". La función del *avalúo del caudal* relicto está aquí igualmente encomendada al contador-partidor, según lo dispuesto en los arts. 601, 602 y 603 del Código de Enjuiciamiento Civil, 32 L.P.R.A. secs. 2622, 2623 y 2624, a quien se le faculta para examinar testigos y peritos. Distinto a lo que ocurre con el art. 570, que no da procedimiento alguno para discutir el inventario, Cf.: *Ex parte Solla*, 15 D.P.R. 780, el 603 provee una vista plenaria ante el tribunal para conocer y resolver las impugnaciones al informe del contador sobre *avalúo* y división.

(⁴) Arts. 62–66; 73–77; 162–198 del Código de Comercio (ed. 1932), 10 L.P.R.A. secs. 1181–1185, 1221–1225, 1521–1557. El comisionista puede desempeñar la comisión contratando *en nombre propio* o en el de su comi- .

dedicaba también a un negocio de préstamos personales con y sin garantías hipotecarias, muchos de ellos ligados a sus transacciones mercantiles, según señaló la declaración del testigo Ramón H. Vargas y concluyó el tribunal. Quedó demostrado igualmente que él no poseía establecimientos, almacenes u otros *activos fijos* corpóreos o incorpóreos, en relación con sus actividades comerciales, excepto los muebles de una oficina situada en su propia residencia valorados en $450. No hay evidencia de contratos de representación o mandatos, exclusivos o no, que se extendieran más allá de la vida del causante. A pesar de la inexistencia de tales bienes o derechos y acciones, el administrador incluyó el "negocio" en el inventario, no sabemos en qué concepto, y no sabemos tampoco, por razón de qué factores le fijó un valor de $45,000.

Basándose en el criterio expresado por la firma de contadores nombrada para preparar el inventario de los bienes relictos en el sentido de que a la fecha del fallecimiento *"debía haber"* varios activos que constituían el *capital* del negocio, sin exponerse en qué consistían esos activos, ni los hechos que sostenían tal creencia, (carta de 30 de noviembre, 2do. párrafo) el tribunal recurrido determinó como cuestión de hecho que al fallecimiento del causante *"tenía que haber* una *cantidad en caja* y una *cantidad en cuentas a cobrar,* las cuales constituían bienes muebles en los que debieron participar todos los herederos". (Énfasis adicionado.) Hecha esa conclusión, y dando por sentado, erróneamente y sin prueba para ello, (5) que el causante llevaba los libros de comercio que específicamente menciona y un sistema integral de contabilidad, y que este sistema fué desmembrado por los herederos opositores después de la muerte, presentándose al adminis-

---

tente—art. 163. La evidencia no fué muy precisa sobre el tipo particular de mediación, o de mandato, que ejercía el causante, véanse: Castán, Derecho Civil Español Común y Foral, Vol. 4, pág. 530 (8a. ed.); Rovira Mola, artículo sobre Comisión Mercantil, IV Nueva Enciclopedia Jurídica, pág. 444, pero no dejó lugar a dudas en cuanto a que el causante no tenía establecimientos como mayorista o detallista.

(5) Escolio 1, ante pág. 687.

trador sólo un libro de préstamos y no los otros libros "en los cuales se hubiese visto el total de los bienes", los segregados y *los retenidos*, nada de lo cual encuentra apoyo en los autos, el tribunal a quo resolvió que esa "cantidad en caja" y "en cuentas a cobrar" representaba un capital del negocio que ascendía a $142,810, siguiendo un método de capitalización de beneficios sugerido por la firma de contadores, incorrecto y a todas luces inaplicable a la situación precisa, como más adelante veremos.

Esas conclusiones no pueden sostenerse. En primer lugar, no se probó la existencia real de tales fondos en caja y cuentas más allá de la mera figuración de los contadores que no constituía evidencia, adoptada por el tribunal a quo como un hecho.(6) Es verdad que las transacciones de azúcar del causante, por lo menos sus transacciones con Coloso de las cuales hay constancia en los autos, requerían de cierto capital ya que la central le facturaba por el azúcar despachado a las distintas personas y entidades. Pero éste era un capital circulante *de operación*, y no un capital de *inversión fijo*, que tal como lo caracterizó el tribunal recurrido, repetidamente se invertía, se recuperaba y volvía a invertirse. De ahí que aun cuando Yumet hubiera hecho compras de azúcar en la zafra de 1949 por valor de $219,880.45 según informaron los contadores, y asumiendo que las transacciones con Guánica se hacían en iguales términos que las de Coloso, ello no conduce ineludiblemente a la conclusión de que a su fallecimiento

---

(6) Pasando por alto la facultad para encomendar a los contadores la preparación del inventario, función impuesta por ley al administrador judicial quien actúa bajo juramento y fianza, con intervención de las partes interesadas y bajo los requisitos expuestos en los arts. 568, 569 y 570 del Código de Enjuiciamiento Civil, y no habiendo actuado ellos como un comisionado especial (*master*) con la facultad de recibir evidencia y someter conclusiones sobre la misma, las manifestaciones extrajudiciales de los contadores sobre la supuesta existencia de bienes relictos no incluídos en la herencia carecen de valor probatorio a menos que tuvieran apoyo en evidencia competente desfilada ante el tribunal. La única comparecencia a corte de los contadores fué para expresar la imposibilidad en que estaban de preparar un inventario en ausencia de libros de contabilidad que no tenían en su poder.

tenía que haber fondos en caja o pendientes de cobro, en exceso de los $40,629.09 inventariados.(7)

Las órdenes para el despacho de azúcar contenían los nombres de las personas y entidades para quienes se despachaba. Conociéndose como se sabía el total del azúcar comprado, por lo menos durante la zafra que precedió a la muerte, fácil hubiera sido al administrador y a los contadores, de haber ellos investigado sobre el terreno, determinar con razonable precisión, y no mediante un proceso especulativo, qué parte de ese azúcar se había vendido y cobrado y qué parte podía estar aún pendiente de cobro o en existencia al morir el causante. Pudo haberse determinado con igual razonable certeza si todo el dinero recibido por el causante procedente de esas operaciones fué o no depositado. En todo caso, de haber llegado el tribunal a la convicción de que podían existir bienes, fondos o cuentas que se ocultaron y no se trajeron al caudal, lo procedente en derecho era ordenar al administrador instituir aquellos procedimientos, dentro o colaterales a la administración judicial, contra el heredero Jorge Yumet, persona que realizaba las transacciones del causante durante los últimos años en su condición de apoderado de éste, y encargado de la herencia durante el período anterior a la administración, o contra quien procediere, para una rendición de cuentas de los fondos y demás activos pertenecientes al caudal, de modo que esta cuestión de hecho, con la fuerte implicación de fraude o de ocultación de bienes que se desprende de la resolución recurrida, se hubiera decidido mediante evidencia competente. *Berman* v. *Leckner*, 52 A.2d 464; *Eisentraut* v. *Cornelius*, 115 N. W. 142; *Young* v. *Dean*, 48 So.2d 779; *In re Ulrich's Estate*, 155 N.Y.S.2d 926; *In re Clemente's Estate*, 138 N.Y.S.2d 254; *Keshner* v. *Keshner*, 33 N.E.2d

(7) Las órdenes y facturas de Coloso, ignoramos las de Guánica, demuestran que en la zafra de 1949 el causante compró azúcares por la cantidad de $10,500 en febrero, $12,000 en marzo y $5,700 en abril. La orden mayor ascendía a $1,500 y las demás fluctuaban entre $1,200 y $300. La compra mayor en un mismo día, febrero 12, ascendió a $6,300. (T. E. págs. 199–213.) Esto da un índice del movimiento de ese capital.

877; *Starkweather* v. *Williams*, 41 Atl. 1003; *Floyd* v. *Victory Sav. Bank*, 189 S. E. 462; *In re Halaska's Estate*, 30 N.E.2d 119; Cf. art. 584, Cod. Enj. Civil, 1933, 32 L.P.R.A. sec. 2471; *Montalvo* v. *Ferrero*, 56 D.P.R. 863; *Trinidad* v. *Sucn. Trinidad*, 19 D.P.R. 647.

En segundo lugar, aun cuando se hubiera establecido como un hecho la existencia de un *capital* en fondos y cuentas pendientes de cobro, fué erróneo el medio utilizado para determinar su cuantía. Como principio general, se ha aceptado, tomándose en cuenta todos los demás factores pertinentes, la capitalización de beneficios como un medio supletorio de fijar el valor de mercado de un inmueble (por encima o por debajo del *costo invertido*) en ausencia de otros índices más directos de tal valor, como son las ventas representativas y otras transacciones voluntarias, o costos de reproducción menos depreciación; o como un medio de fijar el valor de mercado de acciones corporativas aparte del valor en los libros, por lo regular en corporaciones de familia cuyas acciones no están en un mercado abierto; o para determinar el interés de un socio en una sociedad; o para fijar el valor intangible o *plusvalía* (*goodwill*) de una empresa o negocio en funciones, en adición al valor de su planta y demás bienes; para señalar algunos ejemplos ilustrativos. A. D. Jahr, *Eminent Domain, Valuation and Procedure*, Cap. XXII, "Income as Evidence of Value of Real Estate", pág. 225 et seq.; Bonbright, *Valuation of Property*, Vol. I, Cap. XI, "Capitalized Income as a Measure of Value", pág. 216 et seq.; *Condemnation Appraisal Handbook*, Schnutz, "Reproduction and Capitalized Values", pág. 11; McMichael's *Appraising Manual*, 3ra. ed. Cap. 11, "Capitalizing Income into Value", pág. 90; Orgel, *Valuation Under Eminent Domain*, Vol. I, Cap. XIV, "Income as Evidence of the Value of Real Estate–Business Profits", pág. 646; R. H. Forster, "Valuing a Business Interest for the Purposes of a Purchase and Sale Agreement", 4 Stan. L. Rev. 325; A. A. Kragen, "Some Thoughts on the Valuation of Closely Held Business Interests", 43 Calif. L.

Rev. 781; A. E. Grunewald, "An Old Formula in New Attire", 11 Tax L. Rev. 190; Anotaciones 104 A.L.R. 790, 95 A.L.R. 442; Cf. *Sucn. González* v. *Roque González y Cía.*, 33 D.P.R. 569, 580. Pero no sabemos de autoridad alguna, tampoco el Profesor Kester, citado por el tribunal a quo en apoyo de su conclusión, que acepte como un método racional y lógico para establecer en un determinado momento la existencia y cuantía de fondos y otros activos *no fijos* de un negocio, la capitalización de sus beneficios.([8]) En este caso el método aplicado conduce a la conclusión fundamentalmente ilógica en sí misma por ausencia de relación causal, de que: porque en sus transacciones de azúcar el causante tuvo un beneficio promedio durante tres años de $7,140.50 (en el que se incluyó indebidamente un beneficio calculado de $4,139.78 correspondiente a un período posterior a la muerte), a la fecha de su fallecimiento tenía que haber fondos en caja y cuentas a cobrar por el monto de $142,810. Reducida la cuestión a la sencillez de su realidad, el tribunal resolvió que existían fondos y acreencias por valor de $142,810 que los herederos retuvieron, ocultaron o en alguna forma no pusieron en manos del administrador.

---

([8]) Kester, *Advanced Accounting*, 4th ed. En el ejemplo que aparece en el tercer párrafo de la pág. 366 citado por el tribunal, Kester expone uno de los varios métodos usados para determinar el valor intangible o plusvalía (*good will*) de un negocio en funciones y expresa que bajo ese método se capitalizan las ganancias netas promedio a determinado por ciento convenido, obteniéndose la cantidad o el capital que produciría dicha ganancia promedio al por ciento fijado. La *diferencia* entre tal cantidad y el *capital efectivamente invertido* representaría un valor intangible o plusvalía del negocio (*goodwill*). Kester ilustra el anterior método con el siguiente ejemplo: si con un capital *invertido* de $250,000 se obtiene una ganancia promedio de $60,000 y el por ciento normal de rendimiento en ese tipo de negocio es de 15%, $60,000 representaría el 15% de un capital de $400,000. El valor intangible o plusvalía sería la diferencia entre $400,000 y $250,000, o sea $150,000. Dicho en otra forma, un negocio en funciones con un capital invertido de $250,000 cuyo beneficio normal debe ser el de un 15% para la clase de actividad a que se dedica, debería producir un beneficio promedio de $37,500. Al obtenerse ganancias en exceso por $22,500, éstas representarían un capital adicional del negocio equivalente a $150,000, compuesto de valores intangibles que dan su plusvalía.

■■ En vista de lo ya expuesto, no es preciso que discutamos los otros dos planteamientos de los peticionarios. Basta decir, por si eso fué lo que se intentó al incluirse como un renglón del inventario el negocio de representaciones del causante, que si bien la plusvalía (*goodwill*) de un negocio en funciones es un elemento al cual se le puede dar un valor por sí mismo, y como tal puede formar parte de los bienes relictos junto con una empresa que pasa a la sucesión, nunca dicho valor puede considerarse con abstracción e independencia de la empresa en sí y de sus bienes. *Lavene* v. *City of Salem*, 229 P.2d 255; *Maola Ice Cream Co.* v. *Maola Milk & Ice Cream Co.*, 77 S.E.2d 910; *Lerner* v. *Stone*, 252 P.2d 533; *Smith* v. *Davidson*, 31 S.E.2d 477; *McIlvaine* v. *City Nat. Bank and Trust Co. of Chicago*, 42 N.E.2d 93; *Grace Bros.* v. *Commissioner of Internal Revenue*, 173 F.2d 170; *Clark* v. *Lucas County Board of Review*, 44 N.W.2d 748. Las actividades mercantiles del causante constituían una relación o mandato personal que terminó con la muerte. No existía, por ende, valor intangible alguno, en adición a los bienes corporales utilizados en dichas actividades comerciales, a ser inventariados como un bien relicto. *In re Leserman's Estate*, 260 N.Y.S. 188; *In re Martin's Estate*, 33 N.Y.S.2d 81; *Coffey* v. *Metro-Goldwyn-Mayer Corp.*, 289 N.Y.S. 882; *In re Bluestein's Estate*, 95 N.Y.S.2d 874; *Magee* v. *Pope*, 112 S.W.2d 891; Cf. art. 198 Código de Comercio, 1932, 10 L.P.R.A. 1557; art. 1623, Código Civil 1930, 31 L.P.R.A. sec. 4481.

Por los fundamentos expresados, *debe anularse la resolución recurrida y eliminarse del inventario la partida de $142,810. Se devolverán los autos originales a la Sala de Aguadilla del Tribunal Superior, para ulteriores procedimientos consecuentes con esta opinión.*